**C.R.A. REALTY CORPORATION,
Plaintiff,**

v.

**ENRON CORPORATION and Goldman,
Sachs & Co., Defendants.**

No. 92 Civ. 7502 (MBM).

United States District Court,
S.D. New York.

Jan. 10, 1994.

David Lopez, Southampton, NY, for plaintiff C.R.A. Realty Corp.

Joel M. Miller, Miller & Wrubel P.C., New York City, for defendant Goldman, Sachs & Co.

Gregory A. Markel, Orrick, Herrington & Sutcliffe, New York City, for defendant Enron Corp.

## OPINION AND ORDER

MUKASEY, District Judge.

Plaintiff C.R.A. Realty Corporation ("C.R.A.") sues to force disgorgement of short-swing profits under Section 16 of the Securities Exchange Act of 1934 (the "Act"), and Rule 16(b) thereunder. C.R.A. asserts that defendant Goldman, Sachs & Co. ("Goldman") misreported the day on which it became subject to Rule 16(b) as a beneficial holder of more than ten percent of the convertible preferred stock of defendant Enron Corporation ("Enron"). Defendants Goldman and Enron claim that Goldman correctly reported the day on which it became a ten percent holder, and that Goldman already has disgorged profits in compliance with Rule 16(b). Plaintiff moves for partial summary judgment on the issue of liability, and Goldman cross-moves for summary judgment. For the reasons set forth below, Goldman's motion for summary judgment is granted.

## I.

This action arises from Goldman's ownership of convertible preferred stock issued by Enron. The parties dispute when Goldman should be considered to have owned ten percent of the convertible preferred stock, and therefore as of when it became obligated to disgorge short-swing profits under Section 16(b) of the Act. See 15 U.S.C. § 78p. The number of shares owned by Goldman at each relevant time is undisputed. However, plaintiff uses actual numbers of shares outstanding to compute Goldman's percentage of ownership and concludes that Goldman crossed the ten percent threshold on November 29, 1991. (Pl. Mem. at 5) Defendants use the number of shares outstanding as reported in public records available at the time of Goldman's purchase of additional shares, and they conclude that Goldman did not cross the ten percent threshold until January 15, 1992. (Goldman Mem. at 7; Enron Mem. at 3–4) It is undisputed that Goldman ceased being a ten percent owner on July 29, 1992.

In late 1991, the actual total number of shares of Enron convertible preferred stock changed frequently because holders other than Goldman converted preferred stock into common stock. (Pl. 3(g) Stmt ¶ 4; Goldman 3(g) Stmt ¶¶ 6, 7) Plaintiff knows the actual number of shares at each relevant date only because Enron produced this information during discovery; those numbers were not public. (Pl. 3(g) Stmt ¶ 4) Goldman maintained the same number of shares throughout November and December of 1991, (Goldman 3(g) Stmt ¶¶ 3, 4) and the alleged change of status to ten percent ownership on November 29 was caused by a reduction in the total number of shares due to conversions by other holders. (Pl. 3(g) Stmt ¶ 4; Goldman 3(g) Stmt ¶ 7) Thus, Goldman took no action to bring about the change in status and had no knowledge of it.

Goldman and Enron contend that Goldman did not become a ten percent owner under Section 16(b) until January 15, 1992, when Goldman made an additional purchase of Enron convertible preferred stock. After that purchase, Goldman crossed the ten percent threshold based on the total number of shares reported in the most recent public disclosures then available—Enron's Form 10Q for the quarter ending September 30, 1991. However, Goldman did not make the necessary filings to show its ownership until July 30, 1992. (Goldman Mem. at 7; Pl. 3(g) Stmt ¶ 9) At the time the filings were made, additional public information was available as to the number of shares outstanding on December 31, 1991. As an alternative to the argument that Goldman should be held responsible for its percentage of the actual number of shares outstanding at all times, plaintiff contends that Goldman should be required at least to use public information

available as of the time of filing. (Pl.Rep. at 7) This would make Goldman a ten percent holder as of December 31, 1991.

Goldman and Enron settled Enron's claim for short-swing profits earned between January 15 and July 29, 1992, for $415,002.40. (Pl. 3(g) Stmt ¶ 12; Goldman 3(g) Stmt ¶ 13) Plaintiff C.R.A., a shareholder of Enron, claims that Goldman is also liable for short-swing profits earned between November 29, 1991 and January 15, 1992, or between December 31, 1991 and January 15, 1992. (Pl. Mem. at 21, 29) For the reasons explained below, I find that Goldman and Enron used the correct number of shares outstanding to compute Goldman's ownership stake in Enron convertible preferred stock. Thus, Goldman was not a ten percent holder for the purposes of Section 16(b) until January 15, 1992, and has fully accounted for its short-swing profits.

## II.

■ Summary judgment is appropriate if the evidence demonstrates that "there is no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Finz v. Schlesinger*, 957 F.2d 78, 81 (2d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 72, 121 L.Ed.2d 38 (1992). Because granting the motion denies the nonmoving party a trial on the merits, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Gibson v. American Broadcasting Cos.*, 892 F.2d 1128, 1134 (2d Cir.1989). Here, no factual issues have been raised regarding the number of shares owned by Goldman or the number of shares outstanding at any point in time. The issue in dispute is purely a matter of law, and summary judgment is appropriate.

## III.

Effective May 1, 1991, the SEC expressly incorporated the rules under Section 13 into those under Section 16 of the Act for the purposes of determining ten percent ownership. *See* SEC Release No. 28869, [1990–1991 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 84,709 at 81,248 (Feb. 8, 1991); 17 C.F.R. § 240.16a–1 (1992). Plaintiff argues that the new provision, Rule 16a–1, incorporated Section 13 only into Section 16(a) of the Act and does not apply to Section 16(b) of the Act, which addresses the disgorgement of short-swing profits. (Pl.Mem. at 13) The interpretation of Rule 16a–1 is critical because Goldman's reliance on publicly available information in calculating its ownership stake is permissible under Rule 13d–1(e). Rule 13d–1(e) provides:

> [A]ny person, in determining the amount of outstanding securities of a class of equity securities, may rely upon information set forth in the issuer's most recent quarterly or annual report, and any current report subsequent thereto, filed with the [Securities and Exchange] Commission pursuant to this Act, unless he knows or has reason to believe that the information contained therein is inaccurate.

17 C.F.R. § 240.13d–1(e). If this provision applies to Section 16(b), Goldman correctly determined its percentage of ownership and is not subject to further disgorgement of short-swing profits.

### A. *Applicability of Rule 16a–1 to Section 16(b)*

■ The terms defined in Rule 16a–1 expressly apply to all of Section 16, including Section 16(b). The rule provides:

> Terms defined in this Rule shall apply solely to Section 16 of the Act and the rules thereunder. These terms shall not be limited to Section 16(a) of the Act but also shall apply to all of its subsections under Section 16 of the Act.

17 C.F.R. § 240.16a–1 (1992). Rule 16a–1 defines "beneficial owner" as "any person who is deemed a beneficial owner pursuant to section 13(d) of the Act and the rules thereunder." 17 C.F.R. § 240.16a–1(a)(1). The rule requires this definition to apply to Section 16(b), which subjects "beneficial owners of more than ten per centum of any class of any equity security" to disgorgement of short-swing profits. 15 U.S.C. § 78p. Accordingly, Rule 13d–1(e), which was promulgated under Section 13 and is relevant to

defining ten percent beneficial ownership, was incorporated into the rules under Section 16(b), and Goldman was entitled to rely on Rule 13d–1(e) and use public information in calculating its percentage of ownership.

Plaintiff argues that Rule 16a–1 incorporated the definition of "beneficial owner" found in Section 13(d), but did not necessarily incorporate the rules defining "ten percent" under Section 13(d). (Pl.Mem. at 15; Pl.Rep. at 3) However, referring to Rule 16a–1, an SEC release states, "the rule[ ] adopted today define[s] ten percent holders under Section 16 as persons deemed ten percent holders under Section 13(d) of the Exchange Act and the rules thereunder." Release No. 28869 at 81,252. The intent of the SEC to define "ten percent" under Section 16 as it is defined under Section 13(d) could not be clearer.

It bears mention that the interpretation of Rule 16a–1 adopted here is consistent with the regulatory scheme envisioned by the SEC. In contrast, the alternative plaintiff proposes would impose an unwarranted burden on holders of convertible securities. Plaintiff argues that Goldman was aware of the conversion feature and therefore should have known that the data contained in Enron's Forms 10Q and 10K were "inaccurate." (Pl.Mem. at 22) Thus, according to plaintiff, "the only way [Goldman] could determine accurately the number of shares in the class was to pick up the telephone and ask Enron." (Pl.Mem. at 22) To require stockholders to telephone the issuer each time they compute their percentage of ownership would be needlessly inefficient. It would certainly be inconsistent with the SEC's goal of "streamlining" and "minimizing" compliance costs. Release No. 28869 at 81,248.

### B. *Timing of Public Information*

I now turn to whether Goldman should have calculated its percentage of ownership using public information available at the time it purchased additional stock, or at the time it filed a Form 3 Report disclosing its ownership stake. Plaintiff points out that Goldman was late in reporting its ownership interest in compliance with Section 16(a), which requires a holder to file a statement disclosing the amount of his or her ownership within ten days after the accumulation of a ten percent stake. *See* 15 U.S.C. § 78p. Although Goldman acquired additional stock which put its ownership over ten percent on January 15, 1992, it did not file until July 30, 1992. To calculate its ownership after the January 15 purchase, Goldman used the total number of shares that had been reported in the latest public filing as of January 15, the date its ownership rose above the ten percent level. However, by the time Goldman made its filing in July, additional public information had become available in Enron's 1991 annual report, which was released on March 26, 1992. (Goldman 3(g) Stmt ¶ 8) The annual report discloses the number of shares outstanding on December 31, 1991, and plaintiff points out that Goldman actually was a ten percent holder on that date. Plaintiff contends that Goldman should have reported that it became a ten percent holder on December 31, 1991 instead of on January 15, 1992.

Although the newly available information indeed reveals that Goldman held ten percent of Enron's convertible preferred stock on December 31, 1991, Goldman's ownership on that date does not subject it to disgorgement of short-swing profits because Goldman had no way of knowing of its ten percent status at that time. On December 31, 1991, there was no publicly available information that would have indicated to Goldman that it had crossed the ten percent threshold. It would be unjust and would not promote the purpose of Section 16(b) to treat Goldman as a company insider, subject to disgorgement, at a time when Goldman was unable to know of that status and behave accordingly. *Cf. Whiting v. Dow Chemical Co.,* 386 F.Supp. 1130, 1134 n. 5 (S.D.N.Y. 1974) (Section 16(b) deems insiders "capable of structuring his dealings to avoid any possibility of taint"), *aff'd* 523 F.2d 680 (2d Cir. 1975); *Drico Industrial Corp.,* SEC No–Action Letter, 1976 WL 11245, 1976 SEC No–Act. LEXIS 1574 (June 25, 1976) (where a shareowner's holdings, relative to the number of shares outstanding, were increased due to issuer's share repurchase and not through any acquisition of securities, report-

ing requirements under Section 13(d) were not triggered).

■ Plaintiff asks the court to apply Rule 13d–1(e) to a shareholder at the time of filing instead of at the time that the ownership stake was changed. Because Rule 13d–1(e) is relied upon by investors when they make investment decisions, the court should look only to the information available at the time of Goldman's actions when determining Goldman's liability for those actions. This approach is consistent with Section 23(a)(1) of the Act, which states that no provision of the Act "imposing any liability shall apply to any act done or omitted in good faith in conformity with a rule, regulation or order of the Commission." 15 U.S.C. § 78w(a)(1). No evidence suggests that Goldman failed to act in good faith and in conformity with Rule 13d–1(e) during the period in question. Thus, Goldman was entitled to rely on then-available public information to measure its ownership stake in Enron convertible preferred stock on December 31, 1991 and on January 15, 1992. Accordingly, Goldman was not a ten percent holder until January 15, and has fully accounted for its short-swing profits.

For the reasons discussed above, Goldman's motion for summary judgment is granted.

SO ORDERED.