**Vartkes BARSAM, George Chamchikian, Elkay Investments, Cornell J. Lazar, Burton Saltzman, Soonja Sue Enterprises, John J. Parven, John N. Parven, Rita Parven, and Parkra Investments, Inc., Plaintiffs,**

v.

**PURE TECH INTERNATIONAL, INC., Yitz Grossman, Werner Haase, and American Stock Transfer & Trust Company, Defendants.**

No. 93 Civ. 3387 (MBM).

United States District Court, S.D. New York.

Oct. 14, 1994.

Richard S. Missan, New York City, for plaintiffs.

Lawrence M. Solan, Melissa A. Cohen, New York City, for defendants.

## OPINION AND ORDER

MUKASEY, District Judge.

Plaintiffs Vartkes Barsam, George Chamchikian, Elkay Investments, Cornell J. Lazar, Burton Saltzman, Soonja Sue Enterprises, John J. Parven, John N. Parven, Rita Parven, and Parkra Investments, Inc. (collectively "plaintiffs") sue defendants Pure Tech International, Inc., Yitz Grossman, and Werner Haase under RICO and state law. Plaintiffs allege breach of contract, fraudulent inducement of contract, breach of fiduciary duty, improper termination of preemptive rights and related claims arising out of various alleged wrongdoings. Plaintiffs ask also that defendant American Stock Transfer & Trust Company, the escrow agent for defendant Pure Tech, be directed to release escrowed shares to plaintiffs.

Defendants have submitted a motion to dismiss claims five through seven, nine, ten, and twelve for failure to state a claim upon which relief may be granted, pursuant to Fed.R.Civ.P. 12(b)(6), and for failure to plead fraud with particularity, pursuant to Fed. R.Civ.P. 9(b). For the reasons set forth below, defendants' motion is denied with respect to claims five through seven, ten, and twelve, but granted with respect to claim nine. Plaintiffs George Chamchikian and Elkay Investments have moved, pursuant to Fed.R.Civ.P. 56(c), for summary judgment on claim eleven, seeking restoration of their preemptive rights. For the reasons set forth below, plaintiffs' motion is granted.

## I.

Plaintiffs, who were holders of 10.7% of the outstanding shares of Pure Tech, assert in their complaint various fraud claims against the defendants. Plaintiffs are all investors in Pure Tech, a company that, among other things, recycles plastic bottles and other used plastic receptacles, as well as glass and metals. (Complt. ¶ 13) All of plaintiffs' allegations stem from Pure Tech's March 1989 public offering, underwritten by D.H. Blair & Co. ("Blair"). The complaint alleges that in August and September 1988, defendants Grossman and Haase told plaintiffs that Blair required 75% of their shares to be deposited with an escrow agent on the date of the public offering. (Complt. ¶ 25) One of the alleged purposes of the public offering was to raise money for the construction of a new plastics recycling plant. (Complt. ¶¶ 22–23) The Prospectus proclaimed that the "majority of the Company's resources will be devoted to the development and construction of the commercial plant." (RICO Case Statement, Exh. 2 at 13)

In alleged reliance on the assurances of Grossman and Haase that the escrow arrangements were mere formalities dictated by Blair, plaintiffs (other than Parkra) agreed to escrow their shares. (Complt. ¶ 28) Also in the Fall of 1988, plaintiff Parkra allegedly agreed to accept a $50,000 promissory note from Pure Tech in lieu of 200,000 shares of Pure Tech common stock. (Complt. ¶ 29) Plaintiffs claim that in March 1989, defendant Grossman informed them that Blair required 81% of their shares to be escrowed. (Complt. ¶ 30) Plaintiffs once again agreed, in alleged reliance on Grossman's assurance that the shares would be released quickly from escrow. (*Id.*)

The Complaint asserts further that on March 29, 1989, the day before the offering was to commence, defendant Haase, on behalf of Pure Tech, insisted that plaintiffs (other than Parkra) "waive" their preemptive rights. (Complt. ¶ 36) Plaintiffs (other than George Chamchikian and Elkay Investments) agreed to do this. On the eve of the public offering, Pure Tech amended its Certificate of Incorporation to eliminate shareholders' preemptive rights. Plaintiffs allege that the amendment was "invalid, unlawful, and *ultra vires.*" (Complt. ¶ 38)

On March 30, 1989, the offering was complete, and plaintiffs simultaneously escrowed their shares. The Escrow Agreement provided for the release of the shares upon the occurrence of certain events:

(i) 600,000 shares will be released to the stockholders if during the 18 months after the date of this Prospectus, the closing bid price of the Common Stock, as hereinafter defined, for 10 consecutive trading days is in excess of $1.25 per share.

(ii) 2,800,000 shares will be released to the Stockholders if and when the Company achieves Minimum Pre-tax Income, as hereinafter defined, of either $4,000,000 during the year ending December 31, 1991, or $5,000,000 during the year ending December 31, 1992.

(iii) 5,850,000 shares (less any shares released under (i)) will be released to the Stockholders if and when (A) the Company achieves Minimum Pre-tax Income of either $3,500,000, $5,000,000 or $6,000,000 during the years ending December 31, 1991, 1992 or 1993, respectively, or (B) during the 18 months after the date of this Prospectus the closing bid price of the Common Stock, as hereinafter defined, for 20 consecutive trading days is in excess of $2.50 per share.

(iv) all shares held in escrow will be released to the Stockholders if and when (A) the Company achieves Minimum Pre-tax Income of $6,000,000, $8,000,000 or $9,500,000, during the years ending December 31, 1991, 1992, or 1993, respectively or (B) during the 36 months after the date of this Prospectus, the closing bid price of the Common Stock shall average in excess of $3.50 per share for 20 consecutive trading days.

If shares are released under (ii), no more than 3,050,000 shares will be released under (iii) . . .

If none of the foregoing earnings or market price levels are attained, the Escrow Shares will be contributed to the capital of the Company on the later of 39 months after the date of this Prospectus or May 31, 1994.

Rico Case Statement, Exh. 2 at 25–26.

Plaintiffs contend that defendants did not, and never intended to build the recycling plant, and that as a result of this inaction, the shares were not released from escrow and plaintiffs suffered monetary damages.

## II.

The fifth claim alleges that Pure Tech, Grossman and Haase made several false representations in the Prospectus and in personal communications with plaintiffs "concerning the building of the Plant through the use of $2,500,000 of the $5,126,000 net proceeds of the Offering, including . . . the representation that the Plant would be constructed in late 1989 utilizing the aforesaid net proceeds, and the representations that Pure Tech was currently developing engineering plans for the Plant." (Complt. ¶ 105) Plaintiffs claim further that in mid-September 1988, Grossman and Haase informed two plaintiffs that there was a "95% probability" that the escrow conditions would be met. (Complt.

¶ 106) Plaintiffs allege that these representations were "material and false when made, and known to be false by Pure Tech, Grossman and Haase when made ... since each of [the] Defendants knew at all times ... that Pure Tech would not in fact build the Plant, as promised." (*Id.*)

In support of this claim, plaintiffs allege that the money ear-marked for the plant was never used, no land or building for the plant was ever purchased or leased, engineering plans were never developed, no steps were taken to solicit bids for the plant, and Pure Tech never sought local zoning or other regulatory permission to build the plant. (Complt. ¶ 110)

The sixth claim alleges fraudulent concealment of defendants' knowledge that the plant would not be built, and defendant Grossman's alleged New York Stock Exchange violations and his permanent bar from the securities industry. Plaintiffs claim that if they had known of these facts they "would not have escrowed their shares." (Complt. ¶ 123)

The seventh claim alleges that "in view of the confidential and fiduciary relationship" between plaintiffs and defendants Grossman and Haase, and considering defendants' superior knowledge and concealment of material facts, "the material and false representations" made by defendants to plaintiffs, relied upon by plaintiffs to their detriment, constituted "constructive" fraud. (Complt. ¶ 127) As a result of this constructive fraud, plaintiffs allegedly suffered damages.

The tenth claim alleges that defendants Pure Tech, Grossman and Haase, through false misrepresentation, induced plaintiffs (other than Chamchikian and Elkay Investments) to waive preemptive rights and enter into the escrow agreements. (Complt. ¶¶ 150–53) Plaintiffs reassert that if they had known that the representations were false, they would not have agreed to waive their preemptive rights. Plaintiffs seek either monetary damages or full restoration of preemptive rights.

The twelfth claim alleges that defendants Grossman and Haase made material false misrepresentations to plaintiff Parkra that induced Parkra to agree to receive a promissory note rather than 200,000 shares of Pure Tech common stock. (Complt. ¶¶ 164–67) Plaintiff Parkra seeks either monetary damages or 200,000 shares of Pure Tech common stock in exchange for the promissory note. (Complt. ¶ 168)

## III.

Fed.R.Civ.Proc. 9(b) provides that "[i]n all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity. Malice, intent, knowledge and other conditions of mind of a person may be averred generally." To comply with Rule 9(b), a "complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989); see *DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987).

"The court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Festa v. Local 3 Int'l Bd. of Elec. Workers*, 905 F.2d 35, 37 (2d Cir. 1990). Thus, a motion to dismiss must be denied "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Morales v. New York State Dep't of Corrections*, 842 F.2d 27, 30 (2d Cir.1988). In deciding a motion to dismiss, the court must accept the plaintiff's allegations of fact as true, together with such reasonable inferences as may be drawn in his favor. *Papasan v. Allain*, 478 U.S. 265, 283, 106 S.Ct. 2932, 2943, 92 L.Ed.2d 209 (1986). Nevertheless, the complaint must set forth enough information to suggest that relief would be based on some recognized legal theory. *Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 687 F.Supp. 832, 836 (S.D.N.Y.1988). "The District Court

has no obligation to create, unaided by plaintiff, new legal theories to support a complaint." *District of Columbia v. Air Florida, Inc.,* 750 F.2d 1077, 1081–82 (D.C.Cir.1984).

■ In addition, in deciding a motion to dismiss, a court in the Second Circuit may consider documents which form the basis of allegations of fraud if the documents are "integral to the complaint." *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.,* 936 F.2d 759, 762 (2d Cir.1991) (affirming dismissal of complaint where prospectus was considered); see also *Kramer v. Time Warner Inc.,* 937 F.2d 767 (2d Cir.1991); *Sable v. Southmark/Envicon Capital Corp.,* 819 F.Supp. 324, 328 (S.D.N.Y.1993); *Adler v. Berg Harmon Assocs.,* 816 F.Supp. 919, 922 n. 3 (S.D.N.Y.1993); *Ferber v. Travelers Corp.,* 785 F.Supp. 1101, 1103–04 n. 6 (D.Conn.1991); *United States v. District Council,* 778 F.Supp. 738, 749 n. 3 (S.D.N.Y. 1991).

### IV.

■ In New York, the elements of a claim for fraudulent inducement are: (1) representation of a material fact; (2) falsity of that representation; (3) scienter; (4) reliance; and (5) damages. *Mallis v. Bankers Trust Co.,* 615 F.2d 68, 80 (2d Cir.1980), *cert. denied,* 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981); *Channel Master Corp. v. Aluminum Limited Sales, Inc.,* 4 N.Y.2d 403, 176 N.Y.S.2d 259, 262, 151 N.E.2d 833, 836 (1958); *Tyson v. Cayton,* 784 F.Supp. 69, 72 (S.D.N.Y.1992)

■ Defendants' motion to dismiss the fifth claim attacks most strongly the third and fifth elements: scienter and damages. Allegations of scienter "are not subjected to the more exacting consideration applied to the other components of fraud." *Ouaknine v. MacFarlane,* 897 F.2d 75, 81 (2d Cir.1990). Despite the requirement that fraud be pleaded with particularity, allegations may be based on information and belief "when facts are peculiarly within the opposing party's knowledge." *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990). Such a relaxed position is warranted when the defendant is a corporation because plaintiffs

will often know "little of the ways in which the corporation's internal affairs are conducted." *DiVittorio,* 822 F.2d at 1248. The scienter element can be satisfied by alleging facts that reveal a motive for committing fraud and a clear opportunity for doing so. *Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir.), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1987).

■ Plaintiffs set forth sufficient actions by defendants to support the scienter requirement. The complaint alleges that Pure Tech failed to take the "customary and necessary steps" to open the plant on schedule, including negotiations for construction contracts, feasibility studies, and preparatory budgets. (Complt. ¶ 110) Plaintiffs' allegations are supported by the statements of former directors of the corporation, Frank Tammera, Sr. and Stanley Levy. (RICO Case Statement at 31–35, 37–38) The complaint establishes also a motive, such as defendants' interest in taking control of the company from the Tammera family, Complt. ¶ 56, and the alleged "showering" of options and warrants granted to Grossman and Haase after the public offering which "would more than compensate [them] for any failure of Pure Tech to release their own escrowed shares." (Complt. ¶¶ 67, 72)

Defendants cite *Stern v. Leucadia Nat. Corp.,* 844 F.2d 997 (2d Cir.), *cert. denied,* 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 109 (1988) to support their motion to dismiss. *Stern* teaches that a claim will fail when it contains little supporting information beyond a "bald allegation" of intent. *Id.* at 1004. Because plaintiffs go well beyond a "bald allegation," *Stern* is not controlling and the scienter requirement is adequately pleaded.

Defendants' argument that plaintiffs did not suffer injury because their non-escrowed shares increased in value as a result of the public offering and subsequent actions by Pure Tech is also unconvincing. If plaintiffs' allegations are true, and defendants fraudulently induced plaintiffs to escrow 81% of their shares, there is no question that if plaintiffs had not been induced into the escrow agreements they would have 81% more shares in their possession, and therefore

would be 81% better off than they now are. Among other things, they could sell their shares or use them as collateral for other ventures.

Because the five elements of fraudulent inducement have been successfully pleaded, defendants' motion to dismiss claim five must fail.

■ Defendants' motion to dismiss the sixth claim, seeking relief for defendants' fraudulent concealment, is also denied. To plead successfully a claim of fraudulent concealment, plaintiffs must allege: (1) a relationship between the contracting parties that creates a duty to disclose; (2) knowledge of the material facts by the party bound to make such disclosure; (3) non-disclosure; (4) scienter; (5) reliance; and (6) damages. *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 152 (2d Cir.1993); *Congress Financial Corp. v. John Morrell & Co.*, 790 F.Supp. 459 (S.D.N.Y.1992). Silence can form the basis for fraud where there is a duty to speak. *Martin Pincus Mktg. v. Sawyer of Napa, Inc.*, 774 F.Supp. 171, 175 (S.D.N.Y.1991).

■ To establish the required duty to disclose, the claim must allege facts showing either (1) a fiduciary or confidential relationship, *Brass*, 987 F.2d at 150; *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.*, 731 F.2d 112, 123 (2d Cir.1984), (2) a situation where one party to a transaction possesses superior knowledge not readily available to another party, and the first party knows the second party is acting on mistaken knowledge, *Ceribelli v. Elghanayan*, 990 F.2d 62, 64 (2d Cir.1993), or (3) some other set of conditions in which minimum standards of good faith and common decency require disclosure, *Fischer v. Kletz*, 266 F.Supp. 180, 188 (S.D.N.Y.1967).

■ All of the elements of fraudulent concealment are satisfactorily pleaded in the sixth claim. As directors of Pure Tech, Grossman and Haase had a fiduciary duty to plaintiffs, and possessed superior knowledge as to the construction of the plant. Further, defendants allegedly failed to reveal their intent not to build the plant, and defendant Grossman failed to inform plaintiffs of his

alleged New York Stock Exchange violations and permanent bar from the securities industry (Complt. ¶ 119), both of which may have led plaintiffs to decide against placing their shares in escrow. The remaining elements have been discussed above, and are well pleaded.

■ Defendants' motion to dismiss plaintiffs' seventh claim, alleging defendants' constructive fraud, is also denied. Under New York law, constructive fraud is defined as "a breach of a duty which, irrespective of moral guilt and intent, the law declares fraudulent because of its tendency to deceive, to violate a confidence or to injure public or private interests which the law deems worthy of special protection." *Brown v. Lockwood*, 76 A.D.2d 721, 432 N.Y.S.2d 186, 193 (2d Dept. 1980). The elements of a cause of action for constructive fraud are the same as those for actual fraud except that scienter is replaced with "the existence of a fiduciary or confidential relationship." *Orderline Wholesale Distrib. v. Gibbons*, 675 F.Supp. 122, 130 (S.D.N.Y.1987) (citing *Brown*, 76 A.D.2d at 733, 432 N.Y.S.2d at 195).

■ Plaintiffs plead the elements of constructive fraud. Defendants, both in the Prospectus and after its dissemination, allegedly promised that the plant would be built. (Complt. ¶¶ 52, 71) In addition, defendants allegedly informed plaintiffs that the escrowed shares would be released quickly. (Complt. ¶ 30) There is also no question that defendants, as directors of Pure Tech, owed plaintiffs a fiduciary duty. As fiduciaries, they were prohibited from acting on any narrow self-interest in dealing with the property of minority shareholders. *Chiarella v. United States*, 445 U.S. 222, 235, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980); *Elfenbein v. American Financial Corp.*, 487 F.Supp. 619, 627 (S.D.N.Y.1980), *affd.*, 652 F.2d 53 (2d Cir.1981). Because plaintiffs' seventh claim adequately pleads the elements of constructive fraud, defendants' motion to dismiss this claim is denied.

■ Plaintiffs' tenth claim, seeking restoration of their preemptive rights, is also well pleaded, thus defeating defendants' motion to have the claim dismissed. The claim has

ample allegations supporting the assertion that defendants fraudulently induced the waivers, thereby breaching their fiduciary duty. The elements of fraudulent inducement have been discussed above, and need no further elaboration. As previously noted, defendants owed a fiduciary duty to plaintiffs. Under New York law, it is a breach of a fiduciary duty to undermine minority shareholders' preemptive rights. *Katzowitz v. Sidler*, 24 N.Y.2d 512, 518, 301 N.Y.S.2d 470, 475, 249 N.E.2d 359, 364 (1969). Plaintiffs have demonstrated also the damage element by asserting that additional shares have been issued by Pure Tech since the March 1989 offering. (Complt. ¶ 67) But for the alleged fraudulent inducement of the waiver of preemptive rights, plaintiffs could have claimed additional shares at a favorable price. Thus, the tenth claim survives defendants' motion to dismiss.

■ Plaintiffs' twelfth claim, alleging the fraudulent inducement of Parkra's agreement to exchange its 200,000 shares of Pure Tech stock for a $50,000 promissory note, also withstands defendants' motion. The complaint alleges not only that Grossman threatened to use plaintiffs' "own moneys" [sic] to launch a legal campaign if they resisted "the attempted dilution of their share interests" (Complt. ¶ 24), but also that Parkra agreed to the exchange in reliance on defendants' construction of the new plant. (Complt. ¶ 29) The other elements required for a fraudulent inducement claim, *see supra*, are also well pleaded.

### V.

Defendants have submitted also a motion to dismiss the ninth claim (the RICO claim) pursuant to Fed.R.Civ.P. 12(b)(6), for failure to plead the requisite RICO pattern. For the reasons set forth below, this motion is granted.

Plaintiffs assert in their RICO Case Statement that defendants engaged in unlawful conduct in violation of 18 U.S.C. § 1962(a)–(c). Plaintiffs claim that defendant Pure Tech issued a fraudulent Prospectus, Registration Statement, Amendments to Registration Statement, Forms 10–K and other reports filed with the SEC, and supplied information for fraudulent press releases. (RICO Case Statement at 5) Plaintiffs allege further that defendants Grossman and Haase made numerous misrepresentations of material facts to plaintiffs and to the SEC, and also violated the mail fraud statute, 18 U.S.C. § 1341. (*Id.* at 6) Plaintiffs repeat the fraudulent inducement claim and allege further that defendants engaged in an "extensive and protracted 'cover-up' misrepresenting to the Plaintiffs ... the reasons for Pure Tech's failure to build the Plant as promised." (RICO Case Statement at 3–4)

Pursuant to 18 U.S.C. § 1961(5), plaintiffs assert that defendants, in carrying out their fraudulent scheme, engaged in a pattern of racketeering activity. The Rico Case Statement lists 19 documents that defendants allegedly mailed "intentionally and for the purpose of executing, and in furtherance of, a scheme or artifice to defraud." (RICO Case Statement at 39) These mailings allegedly constituted mail fraud. (*Id.*) The 19 documents are:

1) Letter from Pure Tech dated August 23, 1988 to the Plaintiffs announcing that D.H. Blair & Co. had signed a "letter of intent" for the offering

2) Pure Tech's Form S–1 Registration Statement filed with the SEC on October 11, 1988 for the registration of its securities, representing that the Plant would be constructed by late 1989 and describing the escrow agreements

3) Letter from Pure Tech to Plaintiffs on November 16, 1988 relating to the escrow of shares

4) Amendments 1 and 2 to Form S–1 Registration Statement, dated November 25, 1988 and March 10, 1989

5) Letter of Pure Tech dated March 3, 1989 relating to the public offering and escrow of shares

6) Prospectus of Pure Tech dated March 22, 1989

7) Form 10–Q filed with the SEC on May 17, 1989

8) Press release of Keith L. Lippert Associates, Inc. dated June 1989 describing Pure Tech's financial outlook

9) Press release of Pure Tech mailed on July 7, 1989 describing the retention of Mr. Izzy Zubin to purchase materials for the Plant

10) Form 10–Q filed with the SEC on September 6, 1989

11) Form 10–K filed with the SEC on December 26, 1989

12) Amended 10–K filed with the SEC on March 2, 1990

13) Form 10–Q filed with the SEC on August 20, 1990

14) Form 10–K filed with the SEC on January 16, 1990

15) Amended 10–K filed with the SEC on August 13, 1991

16) Form 10–K filed with the SEC on December 27, 1991

17) Form SR filed with the SEC on February 21, 1990

18) Form 10–K filed with the SEC on October 13, 1992

19) Form S–3 Prospectus filed with the SEC on March 17, 1993

RICO Case Statement at 40–42.

Documents 1–6 allegedly induced plaintiffs to escrow their shares and relinquish their preemptive rights, and fraudulently induced Plaintiff Parkra Investments to relinquish its stock subscription for Pure Tech shares "in consideration of Pure Tech's commitment to build the Plant." (RICO Case Statement at 43) Documents 2, 4, and 6–11 allegedly "misleadingly represented that the Plant would be built utilizing $2,500,000 of the proceeds of the Offering." Documents 2, 4, 6–8, 10, and 17 allegedly "misleadingly represented that the majority of Pure Tech's resources would be devoted to the development and construction of the Plant." (*Id.*) Documents 2, 4, 6, and 11 allegedly "misleading[ly] represented that engineering plans had been developed for the construction of the Plant and that lease terms and 'contracts' were being negotiated for the Plant." (*Id.*) Documents 14–16 allegedly "misleadingly represented that the Plant was not built solely due to a lack of funds and a shortage of recycling materials." (*Id.*) Finally, documents 12–16, and 18–19 allegedly "perpetuated the defendants' fraudulent scheme by not disclosing ... the reasons for the failure to build the Plant as promised in the Prospectus and in pure Tech's periodic reports and press releases." (*Id.*)

To state a valid claim under § 1964(c), a plaintiff must first allege a violation of the substantive RICO statute. Under § 1962(a)–(c), a plaintiff must allege "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Moss v. Morgan Stanley, Inc.,* 719 F.2d 5, 17 (2d Cir.1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984).

A pattern of racketeering requires "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within 10 years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). To establish the requisite "pattern" of racketeering activity, plaintiff must show that the predicate acts "amount to, or that they otherwise constitute a threat of, continuing racketeering activity." *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195. *See also Beauford v. Helmsley,* 865 F.2d 1386, 1391 (2d Cir.) (en banc) ("our analysis of relatedness and continuity has shifted from the enterprise element to the pattern element"), *vacated and remanded,* 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584, *adhered to upon further consideration,* 893 F.2d 1433 (2d Cir.), *cert. denied,* 493 U.S. 992, 110 S.Ct. 539, 107 L.Ed.2d 537 (1989).

In *H.J. Inc.,* the Supreme Court explained that "Congress was concerned in RICO with long term criminal activity," 492 U.S. at 242, 109 S.Ct. at 2902, and that continuity is "both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future, with a threat of repetition" which extends "indefinitely into the future." *Id.*

The Second Circuit has held that continuity or threat of continuity can be shown by either related predicate acts extending over a long period of time or by reference to external facts that show the defendant's activities are not "isolated" or "sporadic." *United States v. Kaplan,* 886 F.2d 536, 542–43 (2d Cir.1989), *cert. denied,* 493 U.S. 1076, 110 S.Ct. 1127, 107 L.Ed.2d 1033 (1990); *see also Beauford,* 865 F.2d at 1391 ("Congress's goal in fashioning its definition of 'pattern of racketeering activity' was to exclude from the reach of RICO criminal acts that were merely 'isolated' or 'sporadic'" in nature) (quotation omitted).

■ When a RICO claim is based on a defendant's narrowly directed actions toward a single fraudulent end with a limited goal, lasting over a limited period of time, the claim usually fails. *Continental Realty Corp. v. J.C. Penney Co.,* 729 F.Supp. 1452, 1455 (S.D.N.Y.1990). *See also Thai Airways Intl. v. United Aviation Leasing B.V.,* 842 F.Supp. 1567, 1572–73 (S.D.N.Y.1994) ("Any continuing concealment or transfer of the security deposits would not cause any additional harm ... and would not enlarge the scope of the isolated alleged fraud."); *In re Integrated Resources Real Estate,* 850 F.Supp. 1105, 1148 (S.D.N.Y.1993) (dismissing claim based on fraud of two-month duration); *Three Crown Ltd. Partnership v. Caxton Corp.,* 817 F.Supp. 1033, 1044 (S.D.N.Y. 1993) (six-month scheme of racketeering "inadequate to establish closed-ended continuity"); *Barrett v. United States Banknote Corp.,* 806 F.Supp. 1094, 1100 (S.D.N.Y.1992) (dismissing RICO claim based on single act of fraud committed over several months); *Mead v. Schaub,* 757 F.Supp. 319, 322 (S.D.N.Y.1991) (dismissing alleged five-year fraud made to further single scheme); *Ruby Dev. Corp. v. Charrim Dev. Corp.,* 742 F.Supp. 1213, 1216 (E.D.N.Y.1990) (dismissing "single scheme which took place over a finite period of eight months"); *Airlines Reporting Corp. v. Aero Voyagers, Inc.,* 721 F.Supp. 579, 584 (S.D.N.Y.1989) ("there is insufficient threat of continuity to support a RICO cause of action where the racketeering acts involved a brief period of time, relatively few criminal acts, an uncomplicated scheme, few participants, and few victims").

Where Courts have sustained RICO claims based on alleged racketeering acts committed over a short period of time, the claims often covered a variety of fraudulent acts suggesting a multi-faceted scheme. *See Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.,* 879 F.2d 10, 18 (2d Cir.1989) (plaintiffs claim that defendants "engaged in at least five separate fraudulent schemes"), *cert. denied,* 493 U.S. 1022, 110 S.Ct. 723, 107 L.Ed.2d 743 (1990); *Morrow v. Black,* 742 F.Supp. 1199, 1207 (E.D.N.Y.1990) (complaint alleged "defendants engaged in one scheme after another").

■ In "closed-ended" allegations of RICO violations, such as the one alleged here, efforts at covering up the initial fraudulent act are inadequate to satisfy the continuity requirement of the RICO statute. *See Midwest Grinding Co. v. Spitz,* 976 F.2d 1016, 1024 (7th Cir.1992) ("As for the alleged cover-up scheme ... they do nothing to extend the duration of the underlying diversion scheme"); *In re Integrated Resources Real Estate,* 850 F.Supp. at 1148 (Alleging acts of mail fraud after a securities offering "cannot satisfy the continuity requirement necessary to establish a RICO pattern"); *Orrison v. Balcor Co.,* No. 90C752, 1991 WL 556996 (N.D.Ill. Dec. 5, 1991) (mailings made after offer and sale of partnership units fail to constitute requisite continuity to show pattern of racketeering activity).

■ These principles require that the RICO claim in this case be dismissed. As plaintiffs note, defendants' alleged fraudulent scheme was "two-pronged": first they fraudulently induced the placement of shares in escrow, then they concealed their alleged failure to build the plant on time. (RICO Case Statement at 3) However, the second prong was directed only at concealing the first. Eight months elapsed between the first listed predicate act and plaintiffs' placement of their shares into escrow.[1] Once the shares were set aside, the fraud was complet-

---

1. Only four months elapsed, however, between the first letter specifically mentioning the escrow of shares and the placement of the shares into escrow.

ed. All that remained was for defendants to cover up their alleged fraudulent inducement. Documents 7–19 in plaintiffs' RICO statement all support the allegation of the cover-up. These post-offering mailings, although part of the scheme, cannot be said to have furthered the fraud, because the fraud was completed once the shares were placed in escrow.[2]

 Because plaintiffs fail to show "closed-ended" continuity, the complaint must suggest a "distinct threat of long-term racketeering activity, either implicit or explicit" to state a valid RICO claim. *H.J., Inc.,* 492 U.S. at 241–42, 109 S.Ct. at 2902. Such a threat can be inferred from the nature of the enterprise if it existed for criminal purposes or the predicate acts were part of defendants' regular way of doing business. *Id.* at 242–43, 109 S.Ct. at 2902–03. The RICO Case Statement does not satisfactorily allege that defendants' acts are a part of Pure Tech's ongoing legitimate business. *See Barrett,* 806 F.Supp. at 1101; *Mead,* 757 F.Supp. at 323 ("There is nothing to suggest that the enterprise is in the business of or depends on the commission of acts of mail and wire fraud by its employees in the conduct of its day to day affairs"). Plaintiffs' RICO claim therefore is dismissed.

In a case that also dismissed plaintiffs' RICO claim, the Third Circuit noted, "[v]irtually every garden-variety fraud is accomplished through a series of wire or mail fraud acts that are 'related' by purpose and spread over a period of at least several months." *Marshall–Silver Constr. Co. v. Mendel,* 894 F.2d 593, 597 (3d Cir.1990). The allegations contained in plaintiffs' complaint here do little more than to suggest ordinary fraud that occurred over a limited period of time. In such situations, a RICO claim should not survive. *See In re Integrated Resources,* 850 F.Supp. at 1148 (dismissing plaintiffs' RICO action because it "is nothing more than an ordinary fraud case clothed in the Emperor's trendy garb"). Thus, plaintiffs' complaint

fails to satisfy the requisite RICO pattern and therefore must be dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

## VI.

 Plaintiffs George Chamchikian and Elkay Investments have moved for summary judgment on their eleventh claim. This claim alleges that defendant Pure Tech failed to follow the required statutory and corporate procedures when it amended its certificate of incorporation ("certificate") to delete shareholders' preemptive rights. (Complt. ¶¶ 159–63) Chamchikian and Elkay seek restoration of their preemptive rights for all shares, securities, options, warrants and other rights of Pure Tech issued after March 30, 1989. Plaintiffs' motion is granted.

Prior to the alleged illegal amendment to Pure Tech's certificate, the certificate granted preemptive rights to each shareholder. (Pl. 3(g) Exh. 4) Section 7(b) of Article III of Pure Tech's by-laws provided that any action taken in writing by Pure Tech's board of directors, in lieu of a meeting, required approval by all directors entitled to vote. (Pl. 3(g) Exh. 7 at 6) Under Delaware General Corporation Law ("DGCL"), unless otherwise provided for in the certificate or by-laws, there can be no action by a board in lieu of a meeting unless all members consent in writing. Del.Code Ann. tit. 8, § 141(f) (1984) (Pl. 3(g) Exh. 10). The DGCL provides further that a certificate or by-laws may specify the necessary shareholder vote required to approve corporate action. Del. Code Ann. tit. 8, § 216 (1987) (Pl. 3(g) Exh. 10). Pure Tech's by-laws, Article II § 6(a), stated that "except as otherwise provided by statute or by the Certificate of Incorporation, any corporate action, other than the election of directors, to be taken by vote of the shareholders, shall be authorized by a two-thirds majority of votes cast at a meeting of shareholders." (Pl. 3(g) Exh. 7 at 3) Article II § 6(d) of the by-laws provided that resolu-

---

**2.** Plaintiffs' assertion in their memorandum of law in opposition to the motion to dismiss that the cover-up should supply the required continuity must fail. The cases cited by plaintiff do not involve single acts of fraud subsequently covered up. *See, e.g., Com–Tech Associates v. Computer*

*Associates Int'l,* 753 F.Supp. 1078, 1082 (E.D.N.Y.1990), *aff'd* 938 F.2d 1574 (2d Cir. 1991) (fraudulent inducement followed by the "willful, gross underreporting and misrepresentations of the actual receipts").

1452

tions in writing required unanimous shareholder consent. (Pl. 3(g) Exh. 7 at 4) At the time of the alleged certificate amendment, DGCL § 228 allowed shareholders to act by written consent, in lieu of a meeting, provided that such consent was signed by at least the minimum number of outstanding shares that would be required to take action at a meeting of shareholders, Del.Code Ann. tit. 8 § 228(a), and that prompt written notice of any such acts were provided to all non-consenting shareholders. Del.Code Ann. tit. 8 § 228(d) (Pl. 3(g) Exh. 10). Because Pure Tech's by-laws required a two-thirds vote in a shareholder meeting, DGCL § 228, standing alone, would require that two-thirds of Pure Tech's shareholders approve the board's action in writing.

Thus, for Pure Tech to have amended legally its certificate in March 1989, it would have had to take one of the following two steps: 1) follow its by-laws and have the Board vote unanimously for an amendment in writing and then have the shareholders affirm the vote unanimously in writing; or 2) follow a combination of its by-laws and DCGL § 228 and have the Board unanimously vote for an amendment in writing and then have the shareholders approve the vote in writing by a two-thirds majority.

Defendants argue that "because the certificate specifically gave the board the power to amend the by-laws without shareholder assent (Lucas Aff. Exh D, Article Sixth ¶ 2(a)), [they] understood the board resolution to permit the Company to effect the amendment by using the [DGCL] § 228 consent procedure and by obtaining a simple majority of shareholder votes, the minimum required by statute." (Def.Mem. at 24) The board resolution eliminating shareholders' preemptive rights constituted, according to defendants, "a de facto amendment to the by-laws with respect to this transaction." (Lucas Aff. ¶ 20) Thus, in defendant's view, the amendment not only revised the certificate, but also revised the by-laws to require a simple majority rather than a unanimous vote in writing to approve a certificate amendment by the board.

Defendants' argument is unconvincing. Under Delaware law, an informal by-law amendment is permitted only under limited circumstances. Corporate by-laws may be amended by implication and without formal action only "by clear proof of a definite and uniform custom or usage, not in accord with the by-laws regularly adopted, and by acquiescence therein." *In re Ivey & Ellington, Inc.*, 28 Del.Ch. 298, 42 A.2d 508, 509–10 (1945); *see also Petrick v. B–K Dynamics, Inc.*, 283 A.2d 696, 699 (Del.Ch.1971) (same); *In re Osteopathic Hosp. Ass'n*, 41 Del.Ch. 369, 195 A.2d 759, 762 (1963) (same); *Nowling v. Aero Services Int'l*, 734 F.Supp. 733, 740 (E.D.La.1990) (same). The burden of proof on the issue of course of conduct lies with the party contending that the by-law has been properly altered. *Belle Isle Corp. v. MacBean*, 29 Del.Ch. 261, 267, 49 A.2d 5, 8 (1946). Defendants have offered no evidence that it was customary for Pure Tech corporate actions not authorized by its by-laws to be approved by a simple majority vote of shareholders. Under such circumstances, defendants have not carried their burden of proof and their argument must fail.

The only way, then, that defendants could have amended the certificate legally was for the board to have approved the amendment unanimously, and then for the shareholders to have approved the amendment either unanimously in writing according to the by-laws, or by a two-thirds vote in writing pursuant to a combination of DGCL § 228 and the by-laws. None of these steps, however, was completed.

Pure Tech's by-laws, Article III § 7(b), and DGCL § 141(f), Del.Code Ann. tit. 8, § 141(f), allowed board action without a meeting only with the written consent of all the directors. Not all of the directors gave their written consent at the time the charter was amended. The approval of one of the directors, Frank Tammera, Sr., was not received until April 26, 1989, almost one month after the alleged amendment took place. (Pl. 3(g) Exh. 11) Thus, the board's action was not unanimous, and even if the shareholders had complied with applicable law and approved the amendment, the amendment would still have had no legal effect.

Even assuming, *arguendo*, that Pure Tech's board did unanimously approve the

amendment, Pure Tech's shareholders did not grant the required written consent. Only 57.14% of Pure Tech's shareholders approved the board's action, below both the 100% consent required under Pure Tech's by-laws and the 66.66% consent required under a combination of the by-laws and DGCL § 228. (Pl. 3(g) Exh. 13)

Defendants present two arguments to increase the percentage of the shareholders' written consent. First, they attempt to add to the shareholder consents the shares of the directors. Delaware courts have rejected this procedure. *Belle Isle Corp.,* 49 A.2d at 9. Second, defendants argue that when the number of shares owned by those plaintiffs and others who waived their preemptive rights are added to the 57% shareholders who voted for the amendment, Pure Tech's shareholders actually approved the amendment by 94%. The main precedent defendants rely on for this novel interpretation of shareholder voting is *Stroud v. Grace,* 606 A.2d 75 (Del.1992). *Stroud,* however, is distinguishable from the facts in this case because the shareholder vote there did not violate the corporation's by-laws. *Id.* at 84.

Defendants contend also that plaintiffs' action is barred by Delaware's three-year statute of limitations. (Def.Mem. at 12) The court must first determine if Delaware's statute of limitations applies to this case. It does not.

 In cases based on diversity jurisdiction, a federal court applies the statute of limitations that would be applied by the state in which it sits. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Because plaintiffs are not New York residents and the cause of action accrued outside New York, New York's "borrowing statute," N.Y.Civ.P.L. & R. § 202 (McKinney 1990), applies. The statute provides:

> An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued except that where the cause of action accrued in favor of a resident of the state, the time limited by the laws of the state shall apply.

Thus, which foreign statute of limitations applies depends on where the cause of action "accrued."

 There are two possible approaches to determine where a cause of action accrued for the purposes of the borrowing statute: 1) the traditional place-of-injury approach; and 2) the modern conflicts-of-law approach. Because the New York Court of Appeals has not definitively resolved this issue, the Second Circuit has been forced to predict how New York courts would resolve it.

The first case in which the Second Circuit treated this issue, *Sack v. Low,* 478 F.2d 360 (2d Cir.1973) involved violations of securities laws. Judge Friendly refused to extend the teaching of *Babcock v. Jackson,* 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963) to his analysis of the borrowing statute. *Sack,* 478 F.2d at 367. He could discern "no inkling that the New York courts are applying its sophisticated teachings, rather than the rigid approach of the First Restatement of Conflicts, to the problem of where a cause of action arose under the borrowing statute." *Id.* In *Arneil v. Ramsey,* 550 F.2d 774 (2d Cir.1977) the Court revisited this issue without finding anything "to indicate that New York law has changed in this respect." Although the Court followed *Sack* 's holding, it also engaged in a *Babcock*-inspired analysis of New York's interest in the case. *Id.* at 779. In 1981, the last time the Second Circuit addressed this issue, the Court continued to cite with approval *Sack* and *Arneil,* but did not explain why this approach was still warranted. *Industrial Consultants, Inc. v. H.S. Equities, Inc.,* 646 F.2d 746, 747 (2d Cir.), *cert. denied* 454 U.S. 838, 102 S.Ct. 145, 70 L.Ed.2d 120 (1981); *see also Stafford v. International Harvester Co.,* 668 F.2d 142, 149 (2d Cir.1981) (approving the lower court's conclusion that without definite guidance from the New York Court of Appeals, a "conservative position" was best).

There are at least three reasons why the modern conflicts approach should be applied to an analysis of the "borrowing statute" in this case. First, three of the four Second Circuit cases that rejected the *Babcock* ap-

proach limited their holding to securities fraud litigation. *See Industrial Consultants*, 646 F.2d at 747. The issue presented here is not securities fraud, but rather the proper governance of a Delaware corporation. The interest of a particular state's regulatory scheme rather than that of the federal government therefore is at stake, and that state is not the place of injury. The interest analysis of *Babcock* and its progeny are particularly well suited for such cases. Further, this Circuit has rejected borrowing statutes of limitations, as did the Court in *Sack*, *Arneil*, and *Industrial Consultants*, for claims under § 10(b) of the 1934 Act. *Ceres Partners v. GEL Assocs.*, 918 F.2d 349, 352–364 (2d Cir.1990). Thus, the precedential value of these earlier cases has been seriously undermined.

Second, after *Sack*, New York courts have provided more than the "inkling" Judge Friendly sought that the modern conflicts analysis should be applied. In *Martin v. Julius Dierck Equipment Co.*, 52 A.D.2d 463, 468, 384 N.Y.S.2d 479, 483 (2d Dept.1976), *aff'd*, 43 N.Y.2d 583, 403 N.Y.S.2d 185, 374 N.E.2d 97 (1978), the Court applied the "grouping of contacts, or center of gravity, conflict of laws doctrine" to its analysis of the "borrowing statute." On appeal, the Court of Appeals decided the case on different grounds, and did not analyze the Appellate Division's holding that a more modern approach to the "borrowing statute" applied. *Martin v. Julius Dierck Equipment Co.*, 43 N.Y.2d 583, 403 N.Y.S.2d 185, 374 N.E.2d 97 (1977). At one point, however, the Court of Appeals seemed to endorse the Appellate Division's "interest" test, *id.* at 588, 403 N.Y.S.2d at 187, 374 N.E.2d at 99, while at another point it described the test as the traditional "place of injury." *Id.* at 591, 403 N.Y.S.2d at 189, 374 N.E.2d at 101. At least one commentator has noted that *Martin*, in the Appellate Division's opinion, marked a departure from earlier Second Circuit decisions. *See* N.Y.Civ.Prac.L. & R. § 202, Practice Commentaries C202:3 (1990); *see also Stafford*, 668 F.2d at 149 (discussing ambiguity in Court of Appeal's *Martin* decision).

Third, application of *Babcock*'s interest analysis is especially appropriate considering

that the policy behind the "borrowing statute" is to "protect New York resident-defendants from suits in New York that would be barred by shorter statutes of limitations in other states where non-resident-plaintiffs could have brought suit." *Sack*, 478 F.2d at 367. Here, plaintiffs do not reside in New York.

If interest analysis is used in this case, Delaware's three-year statute of limitations would apply, Del.Code Ann. tit. 10, § 8106, and the claim would be time-barred. All of the issues in this claim involve interpreting both the by-laws of Pure Tech, a Delaware corporation, and Delaware corporate statutes. Delaware has a keen interest in this litigation not only because several provisions of one of its corporation's by-laws have been allegedly violated, but also because plaintiffs' claim implicates several sections of Delaware's general corporate laws that effect not just Pure Tech's internal affairs but also the potential governance of thousands of other Delaware corporations which are regulated by the same Delaware laws that are the subject of this litigation. New Jersey, the site of Pure Tech's principal operations and corporate meetings, is the only other state with any interest in this litigation. Because of the nature of this claim, however, Delaware has the superior interest: the issues solely involve a Delaware corporation's internal governance, and do not effect any other state's laws or regulations.

Other district courts have applied the *Babcock* interest test to their analysis of the "borrowing statute," *see Haberman v. Tobin*, 466 F.Supp. 447, 450 (S.D.N.Y.1979); *Natural Resources Corp. v. Royal Resources Corp.*, 427 F.Supp. 880, 884–885 (S.D.N.Y. 1977), but these cases were decided before the reaffirmance of the place-of-injury test in *Industrial Consultants* and *Stafford*. Although the interest test would be especially appropriate in this case, I feel compelled, as have other district judges who favored the interest analysis, *see Avagliano v. Sumitomo Shoji America, Inc.*, 614 F.Supp. 1397, 1405 (S.D.N.Y.1985); *Lang v. Paine, Webber, Jackson & Curtis, Inc.*, 582 F.Supp. 1421 (S.D.N.Y.1984), to follow the Second Circuit's

adherence to the traditional place-of-injury test.

Under this traditional test, if the injury is economic, as it is here, the cause of action accrues where the economic harm was felt. *Arneil,* 550 F.2d at 780. Thus, to the extent that plaintiff Chamchikian, a Michigan resident, became poorer because of Pure Tech's alleged illegal elimination of his preemptive rights, he became a poorer Michigander, while plaintiff Elkay's economic harm was experienced in Nevada, where the partners resided. (Lazar Aff. ¶ 6; Kravetz Aff. ¶ 3) However, under the holding of *Stafford,* 668 F.2d at 151–52, this court cannot apply either Michigan's or Nevada's statute of limitations because defendants, who have no contacts with either Michigan or Nevada, would not be subject to personal jurisdiction in either state. *See* M.C.L. § 600.715 (Michigan's "long-arm" statute); N.R.S. § 14.065 (Nevada's "long-arm" statute); *Casentini v. Ninth Judicial Dist. Court of State in and for County of Douglas,* 110 Nev. 721, ——, 877 P.2d 535, 539 (1994) (listing requirements for personal jurisdiction). In such situations, New York's statute of limitations applies. *Cuccolo v. Lipsky, Goodkin & Co.,* 826 F.Supp. 763, 767–68 (S.D.N.Y.1993). Because this claim is based on alleged contract violations, New York's statute of limitations is six years. N.Y.Civ.Prac.L. & R. § 213(2). Plaintiffs' claim therefore is timely.[3]

Defendants' amendment of its certificate having violated both its by-laws and Delaware law, and the claim having been timely brought, the only remaining issue is what the remedy is under Delaware law for such improper corporation action. Delaware courts would void such corporate action. *See, e.g., Jackson v. Turnbull,* No. Civ.A. 13042, 1994 WL 174668 at *6 (Del.Ch. Feb. 8, 1994) (corporate action is void when it violates DGCL); *Russell v. Morris,* No. Civ.A. 10009, 1990 WL 15618 at *6 (Del.Ch. Feb. 14, 1990) (when corporate action is invalid, court can "declare the transaction invalid and determine an appropriate remedy"); *Frantz Mfg. Co. v. EAC Indus.,* 501 A.2d 401, 407

(Del.1985) (violation of by-laws "nullified any board action"). Because the amendment to the charter eliminating plaintiffs' preemptive rights is void, plaintiffs are entitled to restoration of those rights. *See* 11 William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 5141 (perm. ed. 1986) (discussing rule and citing cases).

Defendants' papers fail to present any issue of material fact. Under these circumstances, plaintiffs' motion is granted as to the eleventh claim. *Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 572 (2d Cir.1993); *C.R.A. Realty Corp. v. Enron Corp.,* 842 F.Supp. 88, 90 (S.D.N.Y.1994) ("The issue in dispute is purely a matter of law, and summary judgment is appropriate").

\* \* \*

In sum, defendants' motion to dismiss is denied as to claims five through seven, ten, and twelve, but is granted with respect to claim nine. Plaintiffs' motion for summary judgment on claim eleven is granted.

Although plaintiffs have warded off a dismissal motion, they should be aware that there is strong evidence in defendants' papers that plaintiffs' complaint was filed in violation of Fed.R.Civ.P. 11. If, for example, defendants' allegation that plaintiffs have "seen lease negotiation documents and voluminous engineering drawings" relating to construction of the plant (Def.Reply Mem. at 15 n. 7) proves to be true, then plaintiffs' claim that no such plans were ever made must have been asserted in bad faith. Further, defendants have produced a letter submitted to the SEC in January 1990 (Def.Reply Mem.Exh. B), which was allegedly in plaintiffs' possession before the complaint was filed, that disproves plaintiffs' claim (Pl. Mem. at 50–51) that Pure Tech only retroactively gave reasons for the failure of the plant's construction in 1991. A conference will be held on November 10, 1994 to determine whether plaintiffs, having won the battle under Fed.R.Civ.P. 12(b)(6), should retreat from the field before they lose the war under Fed.R.Civ.P. 56 and 11, and to determine also whether judgment should be en-

---

**3.** Defendants' assertion that plaintiffs' claim is barred by laches and other equitable principles fails also because there is no evidence that plain-

tiffs unreasonably delayed in bringing suit. *See Meyers v. Asics Corp.,* 974 F.2d 1304, 1307 (Fed. Cir.1992).

tered separately on plaintiffs' eleventh claim, and the underlying issue of law certified pursuant to 28 U.S.C. § 1292(b).