**Walter C. KEENIHAN and Leta B. Keenihan, Plaintiffs–Appellants**

v.

**HERITAGE PRESS, INC., Debtor; Ronald G. Oberlag; Gail Oberlag, Defendants–Appellees.**

No. 93–2715.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 12, 1994.

Decided March 25, 1994.

Michael R. Johns and Monte D. Estes, Little Rock, AR, for appellants.

Geoffrey B. Treece, Gregory M. Hopkins, and Patrick R. James, Little Rock, AR, for appellee.

Before HANSEN, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and KOPF,* District Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

The Keenihans appeal the district court's affirmance of the bankruptcy court's denial of their motion to dismiss. We reverse and remand with instructions to dismiss the debtor's bankruptcy petition.

---

* The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska, sitting by designation.

## I. BACKGROUND

Heritage Press was established in 1962 by Walter Keenihan and was incorporated under the laws of Arkansas in 1975. Until January 2, 1986, Walter and his wife, Leta, owned a controlling interest in the company and controlled its operation. In late 1985, Ron Oberlag, Leta's nephew, discussed the possibility of transferring control of the company to Oberlag. On January 2, 1986, the Keenihans sold their stock to the corporation in return for a promissory note that was guaranteed by Oberlag. The corporation then granted the Keenihans a security interest in the stock pursuant to a written Security Agreement and Pledge. Only two sections of the pledge agreement are pertinent to this appeal. The first is section III, which states:

> So long as note is not in default, Pledgor hereby appoints Pledgee his attorney-in-fact to arrange for the transfer of securities on the books of the issuing corporation to the name of Pledgee. In the event of default, Pledgee may exercise all the rights and privileges in connection with securities to which a transferee may be entitled as the record holder thereof, together with the rights and privileges otherwise granted hereunder. Pledgee shall be under no obligation to exercise any such rights or privileges.

The second relevant section is section VI, which states that "[d]uring the term of this Agreement, Pledgor shall have the right, where applicable, to vote securities on all corporate questions, and Pledgee shall execute due and timely proxies in favor of Pledgor for this purpose."

After this transaction was concluded, Oberlag was left as the majority stockholder. Walter resigned as Heritage's president, but Leta retained her position as director. Oberlag became president of the company and assumed responsibility for the company's daily operations.

The notes went into default in October 1992.[1] On October 13, Walter wrote Oberlag, advising him of the default and informing him that he was calling a shareholder's meeting for October 19. At the meeting (which was attended by all the shareholders, including the Keenihans and Oberlag), the Keenihans announced they were exercising their rights under the pledge agreement to vote the pledged shares, then voted to replace Oberlag with Walter as the Heritage's president. Two days later, the Keenihans obtained a temporary restraining order enforcing the actions taken at the October 19 meeting.[2] Oberlag then issued notice of a shareholder and director meeting scheduled for November 4. In response, Walter Keenihan directed that the pledged shares be transferred into the Keenihans' names on Heritage's books. This change took place on November 2.

The meeting was postponed to November 16 because Oberlag was ill.[3] At the meeting, Oberlag refused to allow the Keenihans to vote the shares. The Keenihans insisted that they be allowed to vote the stock, so Oberlag voted to adjourn, and left. After Oberlag left, the Keenihans voted all their shares against each of the items specified in the notice announcing the meeting, including a proposal that Heritage file for relief under Chapter 11 of the Bankruptcy Code.

Meanwhile, Oberlag was having his own meeting. He voted in favor of filing bankruptcy, and filed the petition on behalf of Heritage the next day. The Keenihans filed a motion to dismiss,[4] alleging Oberlag lacked

---

1. Payments became more than ninety days delinquent, an event the note defined as a default.

2. The record does not clearly reflect the fate of the state court action that spawned the TRO; presumably, proceedings were halted once the bankruptcy petition was filed.

3. In the meantime, on November 6, the Keenihans gave notice that the pledged shares would be sold at a public sale on November 16. The Keenihans purportedly purchased the shares at this sale, which apparently was supposed to be a public sale pursuant to the Uniform Commercial Code. We see no need to relate or resolve the many arguments about the effect of this sale because it has no bearing on our decision.

4. The motion was actually one asking that the court either dismiss the petition or hold it in abeyance. Both requests for relief were denied, but the notice of appeal indicates the appeal is only of the motion to dismiss. Accordingly, we shall not discuss whether the matter should have been held in abeyance pending state court proceedings.

the authority to file for bankruptcy relief on Heritage's behalf. The bankruptcy court denied the motion, and the district court affirmed this decision. The Keenihans have appealed.

## II. DISCUSSION

A person filing a voluntary bankruptcy petition on a corporation's behalf must be authorized to do so, and the authorization must derive from state law. *Price v. Gurney*, 324 U.S. 100, 106, 65 S.Ct. 513, 516, 89 L.Ed. 776 (1945). We review de novo the district court's legal determinations about the rights possessed by Oberlag and the Keenihans and its ultimate conclusion that Oberlag was authorized to file the bankruptcy petition on Heritage's behalf. *Salve Regina College v. Russell*, 499 U.S. 225, 231, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991). To make our (and the reader's) task easier, we note that the outcome in this case depends upon one principle issue: whether the Keenihans were authorized to vote the pledged shares at the time Oberlag voted to file the bankruptcy petition. It is abundantly clear that if the Keenihans were permitted to vote the pledged shares, they possessed a sufficient majority to deny Oberlag the requisite authorization to file the bankruptcy petition. On the other hand, it is equally clear that if the pledged shares could not be voted, then Oberlag possessed a sufficient number of shares to insure approval of his desire to file for bankruptcy relief on the company's behalf. We conclude that the Keenihans had the right to vote the pledged shares. Critical to this conclusion is the existence of the state court's TRO, which gives rise to two independent lines of reasoning in support of our holding.

### A.

Prior to the critical vote, a state court had issued a temporary restraining order that gave effect to the October 1992 Board of Directors meeting and specifically stated that Keenihan, not Oberlag, was Heritage's President. In doing so, the state court validated the Keenihans' votes in favor of this change, thereby implicitly granting them the authority to vote the pledged shares. Because state law, by virtue of the TRO, granted Keenihan the authority to vote his shares, Oberlag lacked the authority necessary to control Heritage.

### B.

Even if the TRO cannot be viewed as granting the Keenihans the power to vote the pledged stock, subsequent action taken by Walter Keenihan pursuant to his TRO-created authority as President did create the power. Prior to the record date for the November 16 meeting, Walter Keenihan directed that the corporate books be changed to reflect the Keenihans as the owners of the pledged shares. As the President of the company, he had authority to make this change, which was contemplated by the pledge agreement.

Section III of the agreement specifies that Heritage appointed the Keenihans its "attorney-in-fact to arrange for the transfer" of the stock on Heritage's books into the Keenihans' name. That same section goes on to say that in the event of default, the Keenihans were entitled to all the rights normally possessed by the record owner of stock. Without doubt, one of the rights normally possessed by owners of stock is the right to vote.

Section III has to be read in conjunction with section VI, which required the Keenihans to issue proxies to Heritage so long as the agreement was in effect. Reading these clauses together, we believe the following sequence of events should have taken place: upon entering the agreement, the Keenihans should have exercised their power to transfer the stock into their names. Then, because the Keenihans were not supposed to have any voice in the corporation so long as the note was being paid, they were obligated to issue proxies to the corporation, thereby depriving them of their power to vote. In the event of a default, the obligation to issue proxies would disappear and, as the record owners of the stock, the Keenihans would have been entitled to vote.

Admittedly, this picture is not painted by either party; instead, the parties have construed bits and pieces of the pledge agree-

ment to their best advantage. However, under the de novo standard we must apply in reviewing this case, we are obligated to construe the entire contract. We believe the intent of the parties, as reflected in the agreement's terms, is particularly clear and unambiguous: the Keenihans were not to have voting rights unless and until there was a breach. Although the Keenihans never exercised their authority to transfer ownership of the stock while the note was not in default (as prescribed by section III), Walter Keenihan's later actions as president certainly gave effect to the parties' intent with regard to the voting rights associated with the pledged stock.

■■■ Though we agree with the bankruptcy court's observation that the issues regarding the corporation's ownership are inseparably intertwined with issues regarding the corporation's debt, we believe it improper for the bankruptcy court to assume jurisdiction over a case simply because there is debt involved; in short, there first must be valid jurisdiction over the matter before a bankruptcy court can proceed. In the absence of a valid petition, a bankruptcy court has no basis upon which to dispose of a corporation's assets or resolve its debt status. Here, the shareholder dispute had to be resolved before any further proceedings took place. However, because the state court had begun resolving the dispute and, in doing so, made provisions dictating who did and did not control Heritage, the matter of Oberlag's authority (or lack thereof) is relatively simple to discern.

■■■ Oberlag raises a series of arguments contesting the TRO's validity. However, the TRO was issued by a state court, so neither we nor the bankruptcy court has jurisdiction to decide the validity of the TRO; the order's validity or invalidity is a matter for the state courts to decide, and we must accept it as valid unless and until an appropriate state tribunal indicates we should do otherwise.[5] Accordingly, because the authority to file for

bankruptcy on a corporation's behalf derives from state law, and because the TRO represents state law that limited Oberlag's powers and expanded the Keenihans' rights, we conclude Oberlag lacked the authority to file bankruptcy petitions on Heritage's behalf.

## III. CONCLUSION

The authority to file bankruptcy for a corporation derives from state law, and Oberlag lacked this authority at the time he filed the petition. Accordingly, we reverse the decision of the district court with instructions to dismiss the bankruptcy petition.

---

5. Of course, if the TRO is dissolved, or the Keenihans are otherwise unsuccessful in the state courts, this could create some difficult problems regarding the effect of Walter Keenihan's actions during his tenure as Heritage's President. In

any event, by the conclusion of the already-filed action in Arkansas state court, there will be a final determination as to who owns the pledged stock and who has the right to control Heritage.