**MANAGEMENT TECHNOLOGIES,
INC., Plaintiff,**

v.

**Peter MORRIS and John
Ridley, Defendants.**

No. 97 Civ. 2146 (LAK).

United States District Court,
S.D. New York.

April 21, 1997.

Barry C. Klickstein, Abrams, Roberts, Klickstein & Levy, Boston, MA, Frank Taddeo, Jr., Woodside, NY, for Plaintiff.

Kevin J. Toner, Rosemary Fanelli, Werbel & Carnelutti, New York City, for Defendants.

## MEMORANDUM OPINION

### (Corrected)

KAPLAN, District Judge.

This case raises an interesting question concerning the powers of the chief executive officer of a publicly-held New York corporation in circumstances in which (1) the corporate by-laws never were amended to reflect creation of the office, and (2) the board of the company is deadlocked. It arises in the context of an internal struggle for control of Management Technologies, Inc. ("MTi"), the shares of which are traded on NASDAQ. The matter is before the Court on two motions. Plaintiff, which obtained an *ex parte* temporary restraining order from the state court prior to removal of this action, seeks a preliminary injunction prohibiting defendants from entering its offices and those of its subsidiaries, from removing or otherwise dealing in any of plaintiff's assets or property, and from taking any actions or doing anything in the name of plaintiff or its subsidiaries. The defendants move for (1) a preliminary injunction requiring MTi to suspend insolvency proceedings commenced in the United Kingdom on behalf of MTi U.K. affiliates and granting certain other relief, (2) summary judgment determining that MTi's institution of those proceedings was unauthorized and that the purported removal of defendants as directors and employees of the subsidiaries was void, and (3) dismissal of the complaint.

### Facts

#### MTi

MTi is a New York corporation formed in 1990. The company is engaged, principally through a number of subsidiaries, in furnishing computer software used in trading operations by banks and similar institutions. Although it is headquartered in New York, a substantial majority of its business is carried out through English subsidiaries and affiliates.[1]

MTi is the sole shareholder of MTI Holdings (UK) Limited ("Holdings"), an English limited liability company which serves exclusively as a holding company. Holdings in turn is the sole shareholder of MTI Trading Systems Limited ("Trading"), also an English company and one of MTi's principal operating companies. MTi is alleged also to be the equitable owner of Winter Partners Limited ("Partners"), an English limited partnership.

MTi has been a troubled company for some time. According to its most recent Form 10–KSB, it lost $12.7 million on revenues of $18.7 million in the 1995 fiscal year and $10.8 million on revenues of $21.2 million in the year ended April 30, 1996. Its cash flow from operating activities was negative in each year, and the company remained active principally on the strength of revenue provided from the sale of common stock and other securities. (Morris Decl. Ex. A, Consolidated Financial Statements)

Given the difficult circumstances in which MTi has operated, it is not surprising that there has been a rapid turnover in leadership. It appears, however, that the corporate formalities have not kept pace with the changes.

The by-laws of MTi[2] provide that the officers of the corporation shall be the president, one or more vice presidents, a secretary, a treasurer, "and such other officers including a Chairman of the Board as may be determined by the Board of Directors." (Fanelli Aff. Ex. A, Art. VI, § 1) They go on to state

---

1. According to its Annual Report on Form 10–KSB for the year ended April 30, 1996, subsidiaries outside the United States accounted for 88 percent of MTi's revenues for that year. (Morris Decl. Ex. A) (Regrettably, there are no numbers on the pages of this voluminous exhibit.)

2. Although it is not material to the determination of this motion, there is no evidence that the by-laws have been amended in any respect pertinent to the present dispute since the company was formed.

that "[a]ll officers ... shall have such authority and perform such duties in the management of the corporation as may be provided in these By–Laws, or to the extent not so provided, by the Board of Directors." (*Id.* § 2) The president specifically is empowered to exercise "general and active management and control of the business and affairs of the Corporation, subject to the control of the Board of Directors." (*Id.* § 6)

According to the Form 10–KSB, Anthony J. Cataldo served as president of the company from December 1991 until June 1994, when he became chairman of the board and chief executive officer. A month later, S. Keith Williams became president and chief operating officer. Although there is no direct evidence of record as to how Messrs. Cataldo and Williams related to one another during their tenures as chief executive officer and president and chief operating officer, respectively, the logical inference to be drawn circumstantially is that MTi in mid–1995 adopted a form of management common to many publicly held companies. The chief executive officer, as the title implies, became the paramount executive official of the corporation, subject only to the direction of the board of directors. *See* 1 American Law Institute, Principles of Corporate Governance: Analasis and Recommendations § 3.01, *cmt. a* (1994) (hereinafter "ALI"). The president and chief operating officer became responsible for day-to-day operations, subject to the superior authority of the chief executive officer and the board. The by-laws, however, never were formally amended, either to reflect the existence and powers of the chief executive officer or to modify the sweeping delegation of authority to the president.

Messrs. Cataldo and Williams did not last long, leaving in July and September 1995, respectively. Peter Svennilson succeeded Mr. Cataldo as board chairman in July 1995 and as chief executive officer in September 1995. He rapidly was succeeded as chief executive officer in October 1995 by Paul Ekon. Mr. Williams was replaced by defendant Peter Morris as president and chief operating officer in November 1995. Mr. Morris still holds these positions. Finally, in February 1997, Michael J. Edison was elected chief executive officer to succeed Mr. Ekon. Thus, at this writing, Edison is the chief executive officer and Morris the president and chief operating officer. The board consists of four persons—Edison, Ekon, Morris and John Ridley.

*The Background of the Present Dispute*

Subsequent to Edison's appointment, there was a falling out between the defendants, on the one hand, and Edison and Ekon on the other. Edison claims that MTi is in dreadful financial condition, a plight he contends was concealed by Morris and Ridley. He asserts that the defendants improperly enriched themselves at the expense of MTi, engaged in inappropriate accounting practices, and otherwise failed to conduct themselves properly. In particular, he contends that Morris and Ridley have been engaged in a scheme to purchase for themselves, through intermediaries, certain assets of MTi's UK subsidiaries at bargain prices and, in consequence, that they have resisted efforts to procure secured financing. Indeed, Edison claims that Morris and Ridley caused the UK subsidiaries to default on obligations to British Inland Revenue in order to precipitate a liquidation of those entities in the course of which they would seek to purchase the assets. According to Edison, MTi's very existence was in peril by early March. The creditors were at the door. Its ability to raise equity capital was at an end. Although it had a debt-free balance sheet, Morris and Ridley allegedly blocked efforts to raise secured debt in order to further the their personal interests.

The defendants, for their part, stoutly deny Edison's charges and counter with charges of their own. They contend that Edison is attempting to gain control of MTi for himself, quite possibly through the vehicle of having an intermediary finance the purchase of debentures convertible into common stock.

It is neither necessary nor practicable to get to the bottom of the charges and counter charges in resolving these motions. The critical points are two, and they are undisputed. First, MTi. Holdings and Trading all were in serious financial difficulty in early March 1997. Second, the MTi board was dead-

locked, as it is divided evenly between two hostile factions—Edison and Ekon on one side and Morris and Ridley on the other.

### Edison's Actions

#### Corporate Action

On March 12, 1997, Edison took the following steps, purportedly pursuant to his authority as chief executive officer:

(a) He executed on behalf of MTi, as sole shareholder of Holdings, a written resolution adopting new articles of association.[3] The new articles permit a majority shareholder of Holdings to appoint and remove directors by written notice.

(b) Edison then gave notice to Holdings, on behalf of MTi, removing all of its directors—including defendants Morris and Ridley—from office and appointing himself as the sole director of Holdings.

(c) As the sole director of Holdings, Edison then adopted a board resolution that Holdings should exercise its rights as sole shareholder of Trading to adopt new articles of association of that company as well. He then executed a resolution adopting new articles of association of Trading identical to those adopted by Holdings.

(d) Pursuant to Trading's new articles, Edison, on behalf of Holdings, executed a notice removing all of Trading's directors—including the defendants—and appointing himself as the sole director of Trading.

(e) As the sole director of Holdings and of Trading, Edison dismissed defendants from their employment by those companies.

### The UK Administration Proceedings

Having removed the defendants from MTi's English subsidiaries, Edison then took the following additional actions on March 13, 1997:

(a) Acting as the sole director of each of Holdings and of Trading, he adopted written resolutions authorizing the commencement of administration proceedings[4] by both companies.

(b) He commenced administration proceedings on behalf of both companies.[5]

(c) Edison executed a petition on behalf of MTi, purportedly as a creditor of Partners, to place Partners in administration as well.

The consequences of placing Holdings, Trading and Partners in administration are hotly contested. Defendants initially submitted an affidavit of counsel which contended that liquidation of the UK subsidiaries was both likely and imminent. MTi claimed that the affidavit was a substantial exaggeration. They submitted a letter from one of the administrators of the companies appointed by the English court, who said that 45 employees have been "made redundant" and that a one or two person office in Vienna has been closed, leaving that operation to be covered out of the Frankfurt office. (Levy Aff. Ex.) No mention was made of any contemplated asset or similar sales. Defendants, however, have provided the Court with a copy of an advertisement that appeared in the *Financial Times* on April 8, 1997 in which the administrators offered Trading and Partners for sale as going concerns. (Morris Decl., Apr. 8, 1997, Ex. F) Moreover, a report of the administrators to the English court, dated March 13, 1997 but first available to this Court subsequent to April 2, indicates that the sale of Trading is among

---

3. The articles of association of an English company are essentially equivalent to the certificate of incorporation of a New York corporation.

4. Administration proceedings under English law are comparable to proceedings under Chapter 11 of the Bankruptcy Code. *In re Brierley,* 145 B.R. 151 (Bankr.S.D.N.Y.1992).

5. According to plaintiff's affidavits, the defendants applied for a discharge of the administration orders issued by the English High Court. Mr. Justice Carnwath denied the application on March 25, 1997. His order was affirmed by the Court of Appeal on March 27, 1997. The bases for the application and for the decisions rejecting it are not entirely clear from the papers now before the Court, although it appears that defendants claimed that Edison lacked authority to cause the filing of the petitions for administration.

the alternative objects of the administration. (Edison Aff., Mar. 3, 1997, Ex. MJE3, § 4.21, filed in *Matter of MTI Holdings (UK) Ltd.*)

There appear also to be substantial disagreements between the administrators, on the one hand, and Messrs. Morris and Ridley, on the other, as to the manner in which the companies now in administration ought to be operated. (*See* Morris Decl., Apr. 8, 1997, ¶¶ 3–8)

*The Present Litigation*

MTi commenced this action in the Supreme Court of the State of New York on or about March 18, 1997 to remove the defendants as directors of MTi for cause and for certain other relief. It obtained an *ex parte* temporary restraining order which, as amended, precludes the defendants from, *inter alia,* entering the offices and from "taking any actions or doing anything in the name of or on behalf of" of MTi or its subsidiaries. Defendants removed the action to this Court on March 26, 1997. On April 2, 1997, at the argument on defendants' motion to vacate the temporary restraining order, this Court clarified that order in certain respects, but otherwise declined to modify it pending determination of this motion, and set the case for trial on May 22, 1997. (Tr., Apr. 2, 1997 ("Tr.")) In declining to modify the temporary restraining order, the Court relied directly upon the statements of MTi's counsel that the only asset sales contemplated, as far as he knew, were "small sales offices located in other countries" and that none of "[t]he principal assets of the company ... are being sold or disposed of." [6] (Tr. 20; *see id.* 30) In view of the advertisement in the *Financial Times,* those representations appear to have been inaccurate.[7]

*The Forthcoming Stockholders' Meeting*

The Court has been advised that Edison has called a meeting of stockholders of MTi for June 30, 1997. It appears likely that the board deadlock will be resolved, one way or the other, at that time.

*Discussion*
*Defendants' Motion for Summary Judgment*

The issue regarding Edison's authority to act might be framed in narrow terms. As a purely technical matter, the only actions he took in his capacity as chief executive officer of MTi were (1) the adoption of new articles of association of Holdings, (2) the removal of the defendants as directors of that company, and (3) the appointment of himself as its sole director. The comparable actions with respect to Trading were taken by Edison in his capacity as the sole director of Holdings, which is the sole shareholder of Trading. The determination to file administration petitions was made by Edison in his capacities as the sole director of Holdings and Trading, respectively. Hence, it might be asserted that the only question before the Court is Edison's authority to restructure Holdings' articles and board.

Understandably, defendants have not taken this position. While Edison, in his capacities as a director of Holdings and Trading, well may have owed duties under English law to creditors, at least given the perilous financial circumstances of those companies,[8] he held those positions as the representative of the sole shareholder of the parent, MTi, and doubtless owed a duty to MTi as well. Moreover, Edison acted by virtue of his position as MTi's chief executive officer, allegedly for the overriding purpose of furthering the interests of MTi. In consequence, it is appropriate to analyze his actions with regard to

---

6. Plaintiff's brief asserted also: "Ridley and Morris have dragged a red herring across the case in an attempt to divert the court's attention from the true state of affairs. Contrary to the argument of defendants' counsel, there is no proceeding pending in London to liquidate assets of MTI's subsidiaries." (Pl. Mem. 5)

7. The Court at this point has no reason to suppose that counsel was aware of the inaccuracy of his statements at the time they were made.

8. Delaware, which may have the most fully developed body of corporate governance law of any of the states, has held that directors of a corporation "[i]n the vicinity of insolvency" owe a fiduciary duty to the enterprise, including creditors as well as to shareholders. *Credit Lyonnais Bank Nederland, N.V. v. Pathe Comm. Corp.,* Civil Action No. 12150, 1991 WL 277613, at *34 (Del.Ch. Dec.30, 1991); *see Geyer v. Ingersoll Publications Co.,* 621 A.2d 784, 787 (Del.Ch.1992).

their overall purpose and effect, which included the filing of administration petitions on behalf of Holdings and Trading.

*Dismissal of Defendants*

The first question presented by defendants' motion for summary judgment is whether defendants properly were removed as directors and employees of Holdings and Trading. As no one questions the power under English company law of MTi and Holdings, as sole shareholders of Holdings and of Trading, respectively, to adopt new articles of association of the UK subsidiaries and to take the other actions complained of, the issue is whether Edison, as chief executive officer, had the power to cause MTi to act as it did.

As a general proposition, "the business of a corporation shall be managed under the direction of its board of directors . . ." N.Y. BUS. CORP. L. § 701 (McKinney 1986). Officers, "as between themselves and the corporation shall have such authority and perform such duties in the management of the corporation as may be provided in the by-laws or, to the extent not so provided, by the board." *Id.* § 715(g).

In this case, Edison acted as chief executive officer, a position which the board of directors had the power to create under Article VI, Section 1, of the MTi by-laws and the governing statute. *Id.* § 715(a). Neither the by-laws, the statute, nor any resolution of the board that has been called to the Court's attention, however, expressly conferred any authority on the chief executive officer. The issue therefore is whether the board, by creating the position of chief executive officer, implicitly empowered its incumbent to take the actions here at issue.

■ The starting point for analysis is the fact that a company's certificate of incorporation and by-laws in substance are a contract between the corporation and its shareholders and among the shareholders *inter se. E.g., In re American Globus Corp.,* 195 B.R. 263, 265 (Bankr.S.D.N.Y.1996). It therefore is not surprising that, in the absence of any prohibitory provision or statute, they may be adopted and amended by acquiescence and custom and usage as well as by explicit action taken with all pertinent formality.[9] *E.g., Barsam v. Pure Tech Int'l, Inc.,* 864 F.Supp. 1440, 1452 (S.D.N.Y.1994); *Matter of Osteopathic Hospital Ass'n of Delaware,* 41 Del. Ch. 369, 373, 195 A.2d 759, 762 (Del.Sup. 1963); *see In re Flushing Hospital and Dispensary,* 288 N.Y. 125, 131, 41 N.E.2d 917 (1942); *Benintendi v. Kenton Hotel,* 181 Misc. 897, 898, 45 N.Y.S.2d 705, 707 (Sup.Ct. N.Y.Co.1943), *affd,* 268 A.D. 857, 50 N.Y.S.2d 843 (1st Dept 1944), *modified on other grounds,* 294 N.Y. 112, 60 N.E.2d 829 (1945); *Petrick v. B–K Dynamics, Inc.,* 283 A.2d 696, 699 (Del.Ch.1971).

The amendment of fundamental corporate documents by implication or acquiescence is not without limits. Under Delaware law, for example, any such informal change must be established "by clear proof of a definite and uniform custom or usage, not in accord with the by-laws regularly adopted, and by acquiescence therein." *In re Ivey & Ellington, Inc.,* 28 Del.Ch. 298, 42 A.2d 508, 509–10 (1945) (quoted in *Barsam,* 864 F.Supp. at 1452). Moreover, the fact that MTi is a publicly-held corporation is relevant to this question, as the need for public availability of governing corporate documents and for certainty in their vitality is substantial. *Cf.* 1 ALI, *Introductory Note to Parts III and III–A (Structure of the Corporation)* 79–81 (classifying corporations on the basis of size and breadth of share ownership in order to facilitate development of different standards pertinent to corporate governance). Nevertheless, in order to prevail on their motion for summary judgment, defendants must establish that Edison's actions were beyond his authority given the facts at bar, viewed in the light most favorable to MTi and drawing all reasonable inferences from them.

■ Here, there is no question that Edison was elected chief executive officer and that he was the third individual to serve in that position, all without any formal amendment of the by-laws which, on their face, reposed paramount executive authority in the president. The fact that the position of chief executive officer had been created was pub-

licly disclosed in MTi's SEC filings. As far as the record discloses, this action is the first challenge to the functioning of any incumbent in that capacity. That the board, by its actions and a settled course of conduct, amended the by-laws to create such a position seems beyond dispute. Determination of the precise scope of the powers conferred, however, must await the development of a record as to what the three incumbents of that position actually have done with the knowledge and acquiescence of the board since 1994, when the first chief executive officer was elected. Hence, it cannot be said on this record that there is no genuine issue of fact as to the scope of the powers thus conferred on the chief executive officer. Even putting aside the additional questions arguably raised as to the powers chief executive officer in the face of a crisis and a deadlocked board, *infra*, defendants are not entitled to summary judgment on this issue.

### *The Administration Petitions*

The question whether Edison, without the approval of the board, had the power to cause MTi's U.K. affiliates, Trading and Partners, to petition the English court for administration presents a somewhat different question. There is nothing here to suggest that the implicit amendment of the by-laws to create the position of chief executive officer conferred upon that office any power more extensive than that previously conferred on the president by the original by-laws. In other words, the Court assumes that the board, in creating the position, intended that the chief executive officer would exercise "general and active management and control of the business and affairs of the Corporation, subject to the control of the Board of Directors." The issue therefore is whether such a delegation of authority would have permitted Edison to place important subsidiaries of MTi in the equivalent of bankruptcy proceedings in the circumstances of this case [10] notwithstanding that it may be assumed that a resolution to do so, had it been presented to the board, would have failed by a vote of 2 to 2.

One way of viewing the problem begins with the text of the by-law delegating powers to the president, powers which appear subsequently to have been conferred implicitly on the chief executive officer. The text empowers the relevant official to "manage[ ] and control ... the business and affairs of the Corporation, subject to the control of the Board of Directors." A literal reading therefore would suggest that the chief executive officer has the power to do anything within the capacious scope of "management and control" unless prevented by the board or by a provision of the by-laws, the certificate or statute. Such a view arguably is consistent with modern realities in publicly-held corporations, in which the role of the board is one of oversight rather than active management, and the officers simply are "obliged to act in a manner that is consistent with the standards of the corporation [citation omitted], and to execute any specific plans, instructions, or directions of the board." 1 ALI § 3.01, *cmt. c; accord,* 1 R. Franklin Balotti & Jesse A. Finkelstein, Delaware Law of Corporations and Business Organizations § 4.8, at 4–195; *see ALI, id. cmt a;*

▮ Another approach involves an analysis of the case law dealing with the implied powers of corporate officers. In general, the chief executive officer of a corporation—an individual functioning as the general manager of the business and often, but by no means always, holding the title "president"—is presumed authorized to make any contract and, by analogy, to take any other action which the board of directors could authorize or ratify, provided the contract or action is one in the ordinary course of the company's business. *Schwartz v. United Merchants & Mfrs.,* 72 F.2d 256, 258 (2d Cir.1934) (L. Hand, J.); *see generally* 3 Isidore Kantrowitz & Sol Slutsky, White on New York Corporations ¶¶ 715.07[2], 715.07[4] (13th ed. 1996) (hereinafter White) (collecting

---

**10.** Under federal law, the authority to file a bankruptcy petition on behalf of a corporation derives from state law. *Keenihan v. Heritage Press, Inc.,* 19 F.3d 1255, 1258 (8th Cir.1994) (citing *Price v. Gurney,* 324 U.S. 100, 106–07, 65 S.Ct. 513, 516–17, 89 L.Ed. 776 (1945)); *In re American Globus Corp.,* 195 B.R. at 265. As the entities in administration both are organized under the laws of the United Kingdom, the Court assumes that English law governs that question.

cases). The question whether a given action is an "ordinary" one usually is one of fact determined by reference to the nature of the business and the manner in which other firms conduct their affairs, among other pertinent circumstances.[11] To be sure, the ordinary course qualification arose because it is more equitable to charge a stranger with knowledge of limitations on the authority of an agent where the agent purports to act in extraordinary than in run-of-the-mill circumstances. *See* 3 WHITE ¶ 715.07[2], at 7–209. But the ordinary course requirement is relevant also to determining the scope of the implied actual authority of an officer because the likelihood that a board intends to delegate authority for a particular matter usually will be related inversely to the significance of the action for the corporation. *See Heaman v. E.N. Rowell Co.*, 261 N.Y. 229, 231–32, 185 N.E. 83 (1933); *Carney v. New York Life Ins. Co.*, 162 N.Y. 453, 454–55, 57 N.E. 78 (1900).

■ In this case, two circumstances point to a conclusion that the board did not intend to empower the chief executive officer to petition for administration of Holdings and Trading absent the affirmative vote of a majority of the directors. First, the filing of insolvency proceedings is a major and unusual step in the life of any corporate entity. Second, while Holdings and Trading are subsidiaries, they are a significant part of the assets and business of MTi. Actions of comparable or lesser importance to other corporations have been held to be extraordinary and therefore beyond the implied powers of a corporate officer.[12] But that is not the end of the matter.

■ The rules governing the authority of corporate officers are a subset of the broader principles of the law of agency. 2 WILLIAM MEADE FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 437 (1990 rev. ed.) (hereinafter FLETCHER). And the law of agency teaches that corporate officers, acting in good faith and with reasonable discretion, implicitly are empowered to protect the corporation where emergency or necessity requires action beyond their usual or regular authority. *Id.* § 443; *see* RE-STATEMENT (SECOND) OF AGENCY § 47 (1958). The theory is that the principal, if aware of the emergent circumstances, would want the agent to act, and so the law implies the requisite authority. This view, moreover, finds contemporary New York support in *West View Hills, Inc. v. Lizau Realty Corp.*, 6 N.Y.2d 344, 189 N.Y.S.2d 863, 160 N.E.2d 622 (1959), where the Court of Appeals upheld the authority of a corporate president to commence a lawsuit on behalf of his company against an affiliate where a majority of the plaintiff's directors held interests in the defendant and therefore were in a position to thwart action on behalf of the enterprise in order to further their separate and conflicting interest. The Court said that "in situations requiring the exercise of such power to preserve and protect the interests of the corporation, it will be implied." 6 N.Y.2d at 346, 189 N.Y.S.2d at 864, 160 N.E.2d 622; *see also Schlanger v. Argo Corp.*, 70 Misc.2d 864, 866, 335 N.Y.S.2d 174, 175 (Civ.Ct.N.Y.Co. 1972).

Viewing the record in the light most favorable to MTi, the party opposing defendants' motion, Edison was faced with a deadlocked board and an imminent threat to the existence of the company. Moreover, on plaintiff's version of the facts, the defendant board members were subject to a conflict of interest and had been guilty of breaches of their duties of loyalty to the company. Assuming that the threat posed by creditors was as

11. *E.g.*, *Burke v. Bevona*, 931 F.2d 998, 1001 (2d Cir.1991); *Farmer v. Arabian Amer. Oil Co.*, 277 F.2d 46, 52 (2d Cir.1960); *Lee v. Jenkins Bros.*, 268 F.2d 357, 370–71 (2d Cir.1959), *cert. denied*, 361 U.S. 913, 80 S.Ct. 257, 4 L.Ed.2d 183 (1959) (Connecticut law); *Schwartz*, 72 F.2d at 258–59; *Twyeffort v. Unexcelled Mfg. Co.*, 263 N.Y. 6,9–10, 188 N.E. 138 (1933); 3 WHITE ¶ 715.07[2], at 7–209; DAVID A. DREXLER, LEWIS S. BLACK, JR., & A. GILCHRIST SPARKS, III, DELAWARE CORPORATION LAW AND PRACTICE § 14.02, at 14–5(1995).

12. *E.g.*, *Heaman*, 261 N.Y. at 231–32, 185 N.E. 83 (lifetime employment contract); *Carney*, 162 N.Y. at 454–55, 57 N.E. 78 (same); *Lord v. U.S. Transp. Co.*, 143 A.D. 437, 450–51, 128 N.Y.S. 451 (1st Dept.1911) (sublease of major asset); *see Highland Views Corp. v. Gerdts*, 190 A.D.2d 954, 593 N.Y.S.2d 902 (3d Dept.1993) (apparent authority).

grave as MTi now claims and that plaintiff can prove its claims against the defendants, there is a substantial basis for concluding that Edison. as chief executive officer, had the power to take such steps as were necessary to place the UK subsidiaries in administration proceedings in order to preserve MTi's assets for the benefit of its creditors and shareholders. Hence, defendants quite plainly are not entitled to summary judgment.

*Defendants' Preliminary Injunction Motion*

Defendants next seek a preliminary injunction "directing plaintiff to take any necessary steps to temporarily suspend the Administrative [*sic*] Proceedings currently pending in London, England."

█ In order to obtain a preliminary injunction, the movant ordinarily is obliged to demonstrate "(a) irreparable harm and (b) either the likelihood of success on the merits or (c) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardship tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979). Where the injunction sought, however, is mandatory—that is, where, *inter alia*, the injunction "will alter, rather than maintain, the status quo"[13]—the movant "must make a 'clear' or 'substantial' showing of a likelihood of success" on the merits. *Jolly v. Coughlin*, 76 F.3d at 473. In either case, a clear showing of a threat of irreparable harm is essential. *E.g., Triebwasser v. American Tel. & Tel. Co.*, 535 F.2d 1356, 1359 (2d Cir.1976). "Absent such a threat, there is no occasion to consider either the merits or the balance of hardships." *Holford USA Ltd., Inc. v. Cherokee, Inc.*, 864 F.Supp. 364, 371 (S.D.N.Y.1994).

*Irreparable Injury*

When the Court heard defendants' application to vacate the temporary restraining order, it was persuaded that the risk of any irreparable changes in Holdings or Trading was speculative. MTi's counsel assured the

Court that no material asset sales were in prospect, and it appeared that no more was underway than the rationalization to conserve cash that usually follows the commencement of a corporate reorganization.

It now appears that the Court was led to an erroneous impression. In view of the advertisement in the *Financial Times*, defendants have suggested with considerable force that the administrators are in the process of actively marketing Trading and Partners, at least the first of which is a significant part of MTi's business. Nor has MTi contested that suggestion in the days since defendants made it. In consequence, the Court assumes that there is a material prospect that MTi will be irreparably injured, absent relief from this Court, in the sense that steps well may be taken that would prevent the reconstitution of the MTi group as it stood prior to the filing of the administration proceedings in London.

*The Merits*

█ The only interlocutory relief sought by the defendants is an order "directing plaintiff to take any necessary steps to temporarily suspend the Administrative [*sic*] Proceedings currently pending in London, England." The reason for that formulation is plain. The administration proceedings in question already are going forward. The administrators are in control of Trading and Partners by virtue of the orders of the English court and are not within the jurisdiction of this Court. It is not even suggested that this Court may enjoin the English proceeding or any action that the English court or its appointees, the administrators, may take. Hence, the defendants in substance seek to have this Court order MTi to take whatever action it can in an effort to halt those proceedings. The relief thus sought is mandatory in character, as it seeks to alter the *status quo* by requiring a party before the Court to take affirmative steps to halt proceedings which are taking place in courts of the United Kingdom. Defendants therefore may prevail only if they have demonstrated a clear or substantial probability of success on the merits. This they have not done.

**13.** *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996) (quoting *Tom Doherty Assoc., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995)).

The fundamental issue bearing on defendants' likelihood of success is whether Edison had the power as chief executive to place the U.K. affiliates in administration. It seems quite likely, for reasons already discussed, that MTi tacitly made the chief executive officer the official charged with general superintendence of the business. Such an officer, in the Court's view, is empowered by New York law to take such action as is reasonably necessary to protect the corporation's assets and business in an emergency situation. The question whether the action taken here was so justified involves a host of issues on which it cannot be said that the defendants have established the requisite likelihood of success [14] In view of this conclusion, it is unnecessary to address the balance of hardships or the question whether the doctrine of comity applies here and, if so, its effect.

### The Motion to Dismiss

The complaint contains three causes of action. The first alleges that defendants have breached their duties as directors of MTi and seeks their removal for cause and other relief. The second in substance alleges trespass and seeks injunctive relief. The third seeks damages for alleged diversion of funds.

Although defendants' order to show cause seeks dismissal of the complaint pursuant to Rule 12(b)(6), they have advanced no argument in support of that relief. Certainly the second and third causes of action state legally sufficient claims, as MTi has the right to control access to its premises and the right to recover any funds wrongfully diverted from it.[15] The first cause of action, however, raises a more serious issue.

Removal of directors for cause is governed by Section 706 of the Business Corporation Law. Removal may be effected by the share-holders or, if the certificate of incorporation or a by-law adopted by the shareholders so provides, by the board of directors. N.Y. BUS. CORP. L. § 706(a). An action to remove a director for cause, however, may be brought only by the attorney general or by the holders of ten percent of the outstanding shares. *Id.* § 706(d). There is no provision for such an action by the corporation itself. *See* 3 WHITE ¶ 706.05. Accordingly, the first cause of action fails to state a claim upon which relief may be granted.

### Plaintiff's Motion for a Preliminary Injunction

The amended temporary restraining order obtained *ex parte* by MTi from the state court prior to removal, which plaintiff seeks to convert to a preliminary injunction, bars the defendants from entering MTi's premises and from "taking any actions in the name of or on behalf of plaintiff as aforesaid." The argument in support of barring defendants from the premises is that defendants, absent relief, may remove or secrete papers from the offices of MTi in order to conceal their alleged wrongdoing.[16] While plaintiff has been none too specific about the other branch of the relief sought, it appears to contend that defendants, having been removed as directors of the subsidiaries and allegedly having been guilty of malfeasance as directors of MTi, ought to be prevented from acting on behalf of those companies. As the relief sought is prohibitory rather than mandatory, the *Jackson Dairy* standard governs the motion.

#### Irreparable Injury

There can be little doubt that the loss of corporate records quite possibly would constitute irreparable injury. Nor can there be much doubt that permitting the defendants to hold themselves out as acting, and to purport to act, on behalf of entities the actual

---

**14.** The Court has not conducted an evidentiary hearing because neither side has requested one and because the record is adequate to make a determination as to interim relief. *See Consolidated Gold Fields PLC v. Minorco, S.A.,* 871 F.2d 252, 256, *amended on other grounds,* 890 F.2d 569 (2d Cir.), *cert. dismissed sub nom. Minorco v. Consolidated Gold Fields PLC,* 492 U.S. 939, 110 S.Ct. 29, 106 L.Ed.2d 639 (1989).

**15.** If defendants' position is that the complaint is insufficient because the suit was instituted without board approval, the motion must be denied as the Court, for reasons already discussed, cannot now say that MTi could prove no facts under which Edison's institution of this action without board approval would have been unjustified.

**16.** They allegedly have sought to gain access to MTi's London offices with all axe and threatened security guards. (Cpt ¶ 13)

authority of which they lack would threaten plaintiff and its affiliates with irreparable injury. There would be a risk that the companies would be bound by the defendants' actions. Perhaps even more troublesome would be the uncertainty that would be promoted by competing claims to corporate authority by two different factions. A threat of irreparable injury therefore exists.

### The Merits and the Equities

■ The plaintiff, for reasons outlined in the discussion of defendants' summary judgment motion, has established a fair ground for litigation on the question whether Edison had the authority to remove the defendants as directors and employees of Holdings and Trading. Defendants therefore may no longer have any authority to act on behalf of the subsidiaries. While Ridley and Morris remain directors of MTi, directors are not agents of the corporation and have no authority as directors to act on its behalf. *See, e.g.,* RESTATEMENT (SECOND) OF AGENCY § 14C (1958). The prospective harm to MTi through permitting the defendants to hold themselves out as *acting* on behalf of these companies if injunctive relief erroneously were denied therefore would far outweigh the prospective harm to the defendants if they were prohibited from doing so in their capacities as directors. The balance of hardships thus weighs decidedly in favor of the plaintiff in this respect.

■ The question of Morris' position as president and chief operating officer of MTi raises a more troublesome question. As the board is deadlocked, he cannot be removed in the immediate future. He therefore is entitled to exercise whatever power remains in that position. But Morris' contention that he is entitled to exercise all of the powers specified in the by-law provision that originally defined the office of president is wide of the mark.

As indicated above, the board's creation of the office of chief executive officer, together with its acquiescence in the manner in which the corporation has been run since 1991,

quite likely resulted in a modification of the by-laws. While there are unresolved issues with respect to the terms and extent of any such modification, the title "chief executive officer," absent contrary evidence, alone implies that the holder of the office has been granted the power necessary and convenient to conducting the ordinary affairs of the company, subject only to the control of the board and the specific provisions of the charter and other by-laws. This in turn implies that the president reports to the chief executive officer and is obliged to respect that official's directions absent a contrary direction or a settled custom and usage, acquiesced in by the board.

■ MTi takes the position that Morris no longer may act as president because Edison, the chief executive officer, has determined that he should do nothing on the company's behalf pending the resolution of this litigation. It argues, therefore, that Morris should be enjoined from doing anything whatever on behalf of the company. But that is too facile a response. To permit Edison to strip the president of the company of all authority in effect would permit him to remove Morris, which MTi concedes he cannot do directly. Morris therefore is entitled to continue as president unless and until removed by the board or the stockholders.[17] *See Delaney v. Georgia–Pacific Corp.,* 278 Or. 305, 564 P.2d 277 (1977). In functioning as president, Morris is entitled to exercise the authority exercised by him prior to Edison's ascendence, subject to any contrary instructions Edison or the board properly may give.

Finally, MTi seeks to keep Morris and Ridley out of its offices and those of its subsidiaries and to prevent spoliation of corporate records.. It seems likely that MTi's allegations concerning an attempted forced access to the company's London premises are exaggerated. (*Compare* Cpt ¶ 13 *with* Morris Decl., ¶ 12) Nonetheless, given the substantial basis for concluding that Morris and Ridley have been duly removed as directors and employees of the subsidiaries and that

---

17. The existence in N.Y. BUS. CORP. L. § 716 of an established means for removal of an officer—board action—forecloses a conclusion that Edison implicitly is empowered by emergent circumstances to remove Morris as President.

Morris' powers as president of MTi have been limited, no proper purpose would be served by allowing Ridley access to the premises, and Morris' access may be limited consistent with his current restricted role. Accordingly, MTi will be granted relief consistent with the proper scope of Morris' activities *pendente lite*.

### Conclusion

Defendants' motions for summary judgment on the counterclaims, a preliminary injunction, and to dismiss the complaint are denied in all respects save that the complaint's first cause of action is dismissed for failure to state a claim upon which relief may be granted.

Plaintiff's motion for a preliminary injunction is granted to the following extent and otherwise denied.

1. Both defendants are enjoined and restrained, *pendente lite*, from (a) entering upon the premises and from acting or purporting to act on behalf of Holdings and Trading, and (b) destroying, secreting, or otherwise spoliating or rendering inaccessible any corporate records of MTi and all of its affiliates.

2. Ridley is enjoined and restrained, *pendente lite*, from acting or purporting to act on behalf of MTi and any of its other subsidiaries and from entering upon the premises of any of them, other than to attend any duly noticed meetings of MTi's board of directors, absent the prior written consent of a majority of the directors or of the chief executive officer of MTi.

3. Morris is enjoined and restrained, *pendente lite*, from:

(a) Acting or purporting to act on behalf of MTi and any of its other subsidiaries, *provided, however*, that nothing herein shall prevent Morris (a) from discharging his responsibilities as president of MTi, to the extent set forth in this opinion, and

(b) Entering on the premises of MTi or any of its other subsidiaries, absent the prior written consent of a majority of the directors or of the chief executive officer of MTi, other than (I) to attend any duly noticed meetings of MTi's board of directors, (ii) during nor-

mal business hours in order to discharge his responsibilities as president of MTi, to the extent set forth in this opinion.

Nothing herein shall prevent defendants or any other person from (I) taking any actions as shareholders of MTi, including without limitation voting or otherwise exercising incidents of ownership of shares or commencing stockholder's derivative actions on behalf of MTi, (ii) soliciting proxies with respect to shares of MTi, or (iii) discharging their duties as directors of MTi unless and until their terms of office expire or they are removed from the board.

The foregoing constitute the Court's findings of fact and conclusions of law.

SO ORDERED.